IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| SHAWN BIGGINS,<br><br>Plaintiff,<br><br>v.<br><br>NORTHERN OHIO MEDICAL SPECIALISTS, LLC<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO.: 23 CV 1917<br><br>JUDGE JAMES R. KNEPP II<br><br>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Now comes Defendant, Northern Ohio Medical Specialists, LLC ("NOMS"), by and through its counsel, Reminger Co., L.P.A., and hereby moves for summary judgment pursuant to Civil Rule 56. Plaintiff brings a retaliation claim under the Taxpayer First Act, 26 U.S.C. § 7623.

*First*, Plaintiff failed to engage in protected activity under the Taxpayer First Act ("TFA") because there is no objectively reasonable basis for his complaint. *Second*, there is no evidence that Plaintiff's complaints were a "contributing factor" to the adverse employment action. *Third*, the record proves Plaintiff's employment would have been terminated even if he did not raise tax-related complaints.

For these reasons, NOMS respectfully requests this Court grant judgment in its favor. A brief in support is attached hereto.

Respectfully submitted,

*<u>/s/ David R. Hudson</u>*
David R. Hudson (0084988)
Jorden R. Messmer (0102652)
Reminger Co., L.P.A.
1 SeaGate, Suite 1600, Toledo, Ohio 43604
Telephone: 419-254-1311
Facsimile:419-243-7830
*dhudson@reminger.com*
*jmessmer@reminger.com*
*Attorneys for Defendant*

## BRIEF IN SUPPORT

## I. INTRODUCTION

This case arises out alleged violations of the anti-retaliation provisions of 26 U.S.C. § 7623(d), *et seq*., by Defendant Northern Ohio Medical Specialists, LLC ("NOMS") in response to Plaintiff's complaints of alleged tax law violations. (Doc. 5, at ⁋⁋ 112-125). NOMS is a physician owned multi-specialty group based out of Sandusky, Ohio. *Id.* at ⁋ 2. Plaintiff Shawn Biggins began working for NOMS in 2017 as a staff accountant. (Doc. 25-1, Deposition of Plaintiff Shawn Biggins, at 49). Plaintiff was promoted to Controller in 2018 during the "rapid[ ]" growth of the company. *Id.* at 57. By 2022, Plaintiff reported to NOMS' Chief Financial Officer, Spadaro. *Id.* at 59. Plaintiff oversaw general accounting and accounts payable. *Id.* Three employees reported to Plaintiff in 2022. *Id.*

### A. January 2022 Initial Complaint

In January 2022 Plaintiff noticed a change in the company's financial statements. *Id.* at 62. Upon further investigation, Plaintiff believed that approximately $150,000 was removed from a special medical group's profits on the financial statements. *Id.* at 63-64. He brought the issue to the CFO the following day. *Id.* at 65. In Plaintiff's words, the CFO stated: "the new owners, you know, their profits were being put in the next year, if I can remember everything correctly." *Id.* at 66. More simply, when employee-physicians were elevated to partners (owners), the amount remaining in the individual-physician's capital account at the end of 2021 was not paid out as wages, and was instead recharacterized on the now-owner physician's 2022 K-1 tax forms. *Id.*; *see also* Doc. 27-1, Deposition of Giovanni Spadaro, at 67-68; (Doc. 21-1, Expert Report of Gary Zwick, at 2).

The reason is simple— an individual cannot receive W-2 wages after elevation to partner;

because the surplus was not paid out until after December 31, 2021, that carryover instead appeared on the K-1. *See* Zwick Report, at 2. Plaintiff alleges this is a violation of "tax law" because the amount was earned while the physician was an employee, regardless of when it was requested and received by the physician – which was after the physicians joined the partnership as owners. The existing partners at NOMS thus pay the taxes for the newly elevated physician-partners. (Biggins Depo., at 176).

After Plaintiff raised the issue in January 2022, the CFO, Spadaro, "explained to him, 'This is the entry. This is correct to ensure their basis carries over and then, for tax purposes, to make sure they pay' taxes on it as a K-1 owner. And then I confirmed with, again, our outside CPA firm." (Spadaro Depo., at 68). Spadaro informed Plaintiff that this method was the approved tax process recommended from the outside CPA firm, Meaden & Moore, following the January 2022 initial complaint. *Id.*; *see also* Doc. 5, at ¶ 56.

**B. Biggins Experienced Personal Issues**

Plaintiff and his wife separated in February 2022. (Biggins Depo., at 45). Plaintiff had to move out of his family home in February 2022 as well. *Id.* at 45-46. He currently has temporary custody of the younger of his two daughters, and the divorce proceeding is still active. *Id.* at 46. On February 23, 2022, the Erie County Sheriff's Department served a Civil Protective Order on Plaintiff which required him to leave his family home. *See* Erie C.P. Civil Protection Order Case #2022-DV-0019; *see also Biggins v. Biggins*, Case No. 2022DR0091 (Erie C.P. 2022); Erie County Sheriff, ECSO-22-000437.

Around the same time, a former direct report of Plaintiff, "Jacqui" complained in her exit interview that Plaintiff made derogatory comments to her, calling her "Superwoman" in a manner she found offensive. (Deposition of Sarah Opfer, at 51). Plaintiff's behavior was observed as

increasingly erratic thereafter. (Spadaro Depo., at 95).

**C. Mid-Year Review**

NOMS conducted Plaintiff's review over the first few months of Summer 2022 where Plaintiff was given $29,000 (36% raise) on July 13, 2022. (Biggins Depo., at 75). The following day Plaintiff sent an email to Spadaro raising two issues: (1) "I did NOT discuss the primary Tax Issue that has happened in 2021 and in 2022 within NOMS and is a major concern[,]" and (2) "How am I not at least at the 'Director' level? How can we possibly be misunderstanding one another this much?" (Biggins Depo., at 69-70).

Spadaro responded (1) "What is the primary tax issue you are referring to? [,]" and (2) "To be honest I was taken back yesterday with your response to a $29,000/36 percent raise and getting you into six figure compensation. You smiling, smirking and laughing at the data was very unprofessional and arrogant. I even asked you what was so funny. This will not be tolerated under my management. The same will go when talking to and emailing other team members." *Id.* at 75-76. Plaintiff stated the tax issue was the same raised in January 2022. *Id.* at 72.

**D. Behavioral Concerns**

Emails (*see e.g.*, Biggins Depo., at Exs. E, F, G, J) Plaintiff sent in early through mid-2022 tell the story best; Plaintiff's behavior devolved through the course of 2022 resulting in unprofessional, combative, and insubordinate actions and attitude. For example, in a discussion regarding implementation of a new system, Plaintiff made inappropriate comments to Spadaro, the CFO and Plaintiff's boss:

> Pls acknowledge my concerns (as Team Leader that is your job) as I have many that go unacknowledged just like this did many time over too. . . . Enjoy the day my friend! 😊

(Plaintiff Depo., 80-82). Citing these interpersonal issues, Spadaro requested that Sarah Opfer,

Chief Human Resources Officer at NOMS, issued a corrective counseling to Plaintiff on November 2, 2022. *See* Biggins Depo., at 84.

**E. Corrective Counseling and Refusal to Meet**

The November 2, 2022 counseling form set forth 16 examples or areas of improvement related to Plaintiff's leadership and communication skills. (Biggins Depo., at 84); *Id.* at Ex. P. The form concluded stating: "Also, your sarcastic, condescending tone in emails and phone calls will not be tolerated any further. Due to the severity of these concerns, we will be placing you on a formal reminder." (Biggins Depo., at 84). Plaintiff refused to sign the counseling form. *Id.* at 86.

Opfer and Spadaro met with Plaintiff for the counseling meeting. Opfer recalled, "We didn't even get through a lot of these points in the initial meeting with him because he got so -- hostile might be too aggressive of a word, but like upset with Gio and pointing at him that I had to stop the meeting when it was, in my eyes, I am just bringing an initial write-up and performance concerns to your attention." (Opfer Depo., at 59-60).

On November 16, 2022[1], Spadaro and Opfer emailed Plaintiff requesting his availability to meet and finalize the counseling. (Biggins Depo., at 87). Plaintiff requested the employee handbook in response, which was provided by Opfer the same day. *Id.* Opfer continued, writing "We have scheduled this meeting on November 30th at 10:00 a.m. Your attendance is required[.]" *Id.* Plaintiff refused on November 17, 2022, responding: "Hi again, Sorry but I have my own meetings on this matter scheduled that week that I cannot reveal and so I cannot make the meeting on 11-30." *Id.* at 88. On November 21, 2022, Opfer stated Plaintiff would need to meet with her and NOMS' CEO, Josh Frederick. *Id.* at 90. Plaintiff refused again on November 28, 2022, stating

1. The full email chain is provided in Biggins Deposition, at Ex. G, and more fully demonstrates Plaintiff's series of events.

"No thank you Sarah. This is a Board level matter." *Id.*

Frederick responded, stating in part: ""Either way, three officers have now requested a meeting to finalize a simple performance review, and we need to retain some type of structure." *Id.* at 91. Plaintiff concedes that Spadaro, Frederick and Opfer had authority over him as executive level officers. *Id.* at 92.

Because of his continued refusal to meet and finalize his counseling, NOMS initially prepared to terminate Plaintiff for insubordination on November 29, 2022, or otherwise grant him a leave of absence if he needed an accommodation. (Opfer Depo., at 76-78). However, during the November 29, 2022, meeting with Opfer and Chief Legal Officer, Ryan Williams, Plaintiff raised the tax issue in response to the pending termination decision; this was the first time that Opfer, Williams, or any NOMS employee outside of Spadaro were informed that Biggins believed there was a "tax issue." *Id.* at 84-85. Immediately when the tax issue was raised, in response to the prospect of termination, Williams stated "We have a compliance committee for this reason. We can talk through your concerns." *Id.* at 85. The termination was not carried out, and the matter was referred to NOMS' compliance committee.

**F. Dual-Tracked Investigations into Behavior and Compliance.**

Once the tax issue was raised in response to the pending-termination, the issue was referred for investigation to the compliance committee. Opfer then recused herself from the Human Resources aspect, and referred the matter to Erika Harrington, Director of Human Resources. Opfer stated to Harrington, "If there are any more concerns, I need to you handle this. I am recusing myself. I have other things that I have to focus on." (Opfer Depo., at 154). Harrington was never informed about the tax issue. *Id.* Harrington described the referral and recusal:

Q. Did [Opfer] indicate why she was doing that?
**A. No.**

Q. Were you aware during this time whether Sarah Opfer had been involved in some complaints that Shawn Biggins had made regarding whether NOMS was violating or breaking certain tax laws in relation to some of the business that it was conducting, tax-wise?
**A. No.**
Q. Were you ever asked to participate in that investigation into any complaints about tax issues?
**A. Never.**
* * *
Q. So you said Sarah wanted to recuse herself from the situation, but she didn't give you a reason as to why she was doing that; is that correct?
**A. Correct.**

(Doc. 28-1, Harrington Depo., at 29-30).

1. Compliance Committee Investigation

The compliance committee consists of a group of physician owners, with Opfer and Williams acting as officers of the committee. (Opfer Depo., at 86-87). The compliance officers took Plaintiff's concerns to outside tax CPA firm Meaden & Moore. *Id.* at 100. Meaden & Moore provided a detailed explanation rebutting Plaintiff's concerns in a December 21, 2022 memorandum. (Biggins Depo., at Ex. Q; Depo., at 159-61). Plaintiff was permitted to prepare handwritten follow-up questions which were returned to Meaded & Moore. *Id.* at 158. On January 23, 2023, Meaden & Moore provided a second memorandum opinion, again explaining for a third-time that NOMS tax policies were in accordance with state and federal law. *Id.* at 162-65.

Plaintiff was unsatisfied with Meaden & Moore because he believed that there was a "conflict of interest" due to the fact NOMS was a large client. *Id.* at 151. There is no common ownership or other factors which would suggest Meaden & Moore, and the CPAs working there, would put there license and liberty on the line to support NOMS' tax strategy – which Meaden & Moore itself developed. *Id.* at 150-52. Plaintiff contends that Meaden & Moore is "good in tax" but believed it did not understand the issue because of the ultimate conclusion it reached in January 2022, December 2022, and January 2023. *Id.* at 170-71. Plaintiff does not point to any information

Meaden & Moore would have needed to reach the ultimate conclusion which it was not provided. *Id.* at 183.

In line with his handwritten notes on the Meaden & Moore memoranda, Plaintiff is still unable to articulate with any degree of specificity which "tax law" renders NOMS' method illegal. He testified:

Q. The partners of NOMS pay the taxes for the new physicians that are being elevated to partner the following calendar year, correct?
**A. They are doing that, but they are doing that incorrectly because those amounts should be on the W-2.**
Q. That's my question.
**A. That's the tax law.**
Q. That's my question. The federal government is being paid these taxes by the other physician partners, correct?
**A. Not correct, no, because like I said, if you're going to carry those into another year, right, there's a whole new set of assumptions and situations going on where those taxes, who knows what will happen to them. You never know. What if the company has a huge loss?**
Q. Did that ever happen?
**A. So I mean, those things -- you don't have a crystal ball, you see?**
Q. Did that ever happen?
**A. Gosh, you know what –**

(Biggins Depo., at 176-77). And when pressed, Plaintiff was unable to identify any law or regulation – in general or specific reference – which were purportedly violated:

Q. Complied with what?
**A. The tax laws.**
Q. Which tax laws?
**A. Those profits were payable to them all through 2021. It was just completely ignored as if it was not administratively feasible to do anything with, and everyone relied on it except me because I knew better. That's why.**
Q. Which tax law says that this is illegal?
**A. There's a lot of them.**

*Id.* at 174. He continued:

Q. When you were looking into these issues, did you uncover a specific statute or revenue code provision that you believe mandated NOMS to follow your method as opposed to the method that they were following?

**A.** **There are IRC code sections that apply to all these things that we are talking about.**
Q. Did you ever provide any of these statute or revenue codes to Meaden & Moore, your superiors, the Compliance Committee or any other person at NOMS or who were working on this issue?
**A.** **No, sir. These are basic kinds of things.**

*Id.* at 181. Astoundingly, Plaintiff testified that he never attempted to determine whether NOMS ever *underpaid* on taxes to the federal government:

Q. NOMS is a limited liability company, correct?
**A.** **Yes.**
Q. Are you aware of any instance where NOMS paid less taxes to the federal government using the method that they used as opposed to the method that you recommended?
**A.** **I never analyzed such a thing on -- I never did that analysis but you know what –**
MR. BEAN:· Just answer the question.
**A.** **No, I never did the analysis.**
**A.** **I don't know.**

*Id.* at 177-78 (emphasis added). And he has *never* had another CPA agree with his position; either during his employment, or in this litgiation. *Id.* at 182. Above all, Plaintiff conceded in his testimony that even he is unsure whether the practice at issue is *actually* a violation of the law:

Q. My understanding is that some of the money earned in '21 that carried into an account in 2022. Is that your concern that that account was not being properly taxed?
**A.** **My concern is, you know, from the basis standpoint of the new owners, since they were never taxed on their W-2s like they were supposed to be as an employee, how are they going to get any basis in the partnership in their capital accounts and is that legal? You know, that's a great question. I'm not a hundred percent sure on that one, but man, that's certainly suspect and very -- you know, I can't believe that that is okay myself.**

*Id.* at 178-79 (emphasis added).

Expert witness Gary Zwick, opined in his expert report:

Biggins should know that every business makes adjusting journal entries at year end to reflect proper accounting entries to comply with financial and tax standards. That he persisted not only after applying his own experience but after hearing from

> the Company CFO and the outside CPA firm appears to me to be entirely unreasonable . . . It is my opinion that Biggin's complaints were both subjectively and objectively unreasonable.

(Doc. 21-1, at 5). According to Zwick's unrebutted[2] expert opinion, Biggins' process *and* conclusions were both objectively unreasonable for a person with his education and experience in this circumstance. *Id.* at 4-5.

2. Harrington Human Resources Investigation

Erika Harrington, Director of Human Resources, was charged Plaintiff's conduct concerns following Opfer's recusal. (Harrington Depo, at 28-29). Importantly— neither Harrington nor any of the interviewees were aware that Plaintiff made a complaint regarding the tax issue. *Id.* Plaintiff himself testified to exactly that:

> Q. Were any of these individuals, Deno, Booker, Ostheimer or McRae, aware of your complaints?
> **A. <u>No, none of them were. They had no idea about any of it.</u>**
> * * *
> Q. How do you know that there's a chilling pressure when you just said that they weren't even aware of the tax issues?
> **A. They weren't aware of the tax issues, but they were aware of the termination-type issues, right[.]**

(Biggins Depo., at 137-38) (emphasis added). These interviewees were Plaintiff's direct reports and peers—not supervisors. *Id.* at 135-36. Harrington personally conducted interviews of each; they all reported demeaning and/or derogatory behavior, emotional outbursts, poor leadership, poor management, and condescending behavior from Plaintiff. *See* Ostheimer Statement, attached hereto as Exhibit A; Booker Statement, attached hereto as Exhibit B; Deno Statement, Exhibit C; and McRae Statement, Exhibit D.

---

2. Plaintiff was repeatedly asked at deposition whether he was offering expert testimony in this case, and failed to state he was. (Biggins Depo., at 152-54). Further, he was not disclosed as a non-retained expert. For these reasons, Plaintiff should be prohibited from introducing his own testimony as an expert opinion.

Harrington's investigation resulted in complaints that Plaintiff "doesn't respect women[,]" others "[did] not feel comfortable working for him[,]" "he always tried to make her feel less than or beneath him in the past or that her time was not as valuable[,]" "displays a temper and even yells at [direct report,]" "had an episode when they were meeting with [a vendor] and he started screaming, and then almost immediately he was remorseful almost to the point of crying[.]" *Id.* Harrington's investigation provides shocking narratives regarding Plaintiff's abusive behavior in the workplace— violating NOMS code of conduct and anti-discrimination policies. *See* Plaintiff Depo, at 133.

Harrington made the decision to terminate Plaintiff on her own:

> Q. I mean, can you think of any situations in your time at NOMS where human resources has fired a non-human resources employee where input or recommendation was not sought from the manager or supervisor?
> **A. In the case of Shawn Biggins, I made that decision on my own.**
> Q. You made that decision on -- you, yourself, made that decision?
> **A. Yeah. After reviewing my statements from team members and documentation.**
> Q. [ ] But you are saying now that in relation to Shawn Biggins' termination, you believe you made that decision directly?
> **A. Correct.**

(Harrington Depo., at 20-21). Harrington made that decision without input from Spadaro or Opfer. *Id.* at 80-81.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. LAW AND ANALYSIS

Plaintiff brings a single claim against NOMS for whistleblower retaliation in violation of the Taxpayer First Act, 26 U.S.C. § 7623(d), *et seq.* ("TFA"). "The Taxpayer First Act (TFA) makes it unlawful for an employer to discharge an employee in reprisal for providing information 'the employee reasonably believes constitutes a  violation of the internal revenue laws or any provision of Federal law relating to tax fraud to the IRS. The plain text of the statute provides that the two-part burden-shifting framework set forth in 49 U.S.C. § 42121(b)(2)(B) applies to TFA claims. *Gammons v. Adroit Med. Sys.*, 91 F.4th 820, 826 (6th Cir. 2024) (internal citations omitted).

"Under this standard, [a plaintiff] has to first establish a prima facie case by presenting evidence that satisfies the following elements: (1) he engaged in protected conduct; (2) the defendants knew of his protected conduct; (3) the defendants subjected him to an adverse employment action; and (4) his protected conduct was a 'contributing factor' when the defendants subjected him to the adverse employment action" *Id.* "Second, even if the evidence allows [a plaintiff] to carry his prima facie burden, the defendants may still defeat the TFA claim by identifying 'clear and convincing evidence' that they would have fired [the employee] even if he had not reported them to the IRS." *Id.*

Plaintiff is unable to satisfy a prima facie case because he did not engage in protected conduct. And, his alleged protected conduct was not a "contributing factor" to the termination decision. Finally, even if a prima facie case is satisfied, NOMS presented clear and convincing evidence that Plaintiff would have been terminated in absence of the protected complaint.

**A. Prima Facie Case**

*1. Unreasonable Complaints are not Protected Conduct.*

Plaintiff failed to provide any basis for his complaint. "[T]o sustain a complaint based on protected activity under [the TFA], the complainant need only show that he or she 'reasonably

believes' that the conduct complained of constitutes a violation of the enumerated laws. . . . reasonable belief involves both a subjective component and an objective component. . . . Objective reasonableness is evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee." *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 811 (6th Cir. 2015) (internal citations and quotations omitted). "The objective prong of the reasonable belief test focuses on the basis of knowledge available to a reasonable person in the circumstances with the employee's training and experience." *Id.* at 810.

In *Tonra v. Kadmon Holdings, Inc.*, the Southern District of New York reasoned that a "plaintiff is not required to prove that the defendants violated a law or cite a particular provision that he believes the defendants violated, [but] general inquiries do not constitute protected activity. For the whistleblower to be protected by [TFA], the reported information must have a certain degree of specificity and must state particular concerns which, at the very least, reasonably identify a respondent's conduct that the complainant believes to be illegal." 405 F. Supp. 3d 576, 589-590 (S. D. N. Y. 2019) (internal citations and quotations omitted). The *Tonra* plaintiff's claims were dismissed because the plaintiff did "not explain[] how it would be reasonable to believe that the failure to disclose the tesevatinib study results until some time in the future violated the securities laws." *Id.* at 591.

Similarly in *Nielsen v. AECOM Tech. Corp*, the Second Circuit held the plaintiff "failed plausibly to allege that he reasonably believed [defendant's] conduct violated an enumerated provision [and] [a]ccordingly, [] deem[ed] [plaintiff's] claim to be insufficient as a matter of law." 762 F.3d 214, 223-224 (2d Cir. 2014). The *Nielsen* plaintiff was employed as Fire Engineering Manager "where he was tasked, *inter alia*, with ensuring that his subordinates' engineering plans

were sufficient under 'applicable fire safety standards.'" *Id.* at 217. The plaintiff complained about fire safety designs that were approved without his review. *Id.* He was then terminated which he alleged was "part of a 'continuing effort to coverup [sic] the false approval of fire safety designs.'" *Id.* (quoting the complaint). *Nielsen* plaintiff alleged the defendant's "practice had the potential of exposing the company to extreme financial risk and thus constituted potential shareholder fraud." *Id.* at 223. The court dismissed the complaint stating it was insufficient as a matter of law because it failed to allege factual matter showing the objectively reasonable basis for Nielsen's view that the defendant violated law. *Id.* at 224.

This Court previously held on the pleadings that "the complaint contains a plain statement of how Defendant's challenged conduct, back-dating physician ownership changes, might violate federal tax law." *Biggins v. N. Ohio Med. Specialists, LLC*, 731 F. Supp. 3d 892, 898 (N.D. Ohio 2024). But now the record is developed, and Plaintiff's own testimony demonstrates the lack of reasonable basis for his conclusion.

*First*, Plaintiff knew from the start that NOMS' tax practice was developed and approved by an outside CPA firm from the start, in January 2022. (Spadaro Depo., at 68) ("And then I confirmed with, again, our outside CPA firm"). *See also* Doc. 5, at ¶ 56. Plaintiff failed to identify any tangible reason to believe that Meaden & Moore had a "conflict of interest" which would motivate the CPAs working on NOMS' tax compliance to risk their license and jail time. (Biggins Depo., 151-52). And he fails articulate why his opinion was reasonable over that of Meaden & Moore's CPAs, resorting instead to the unsupported statement that Meaden & Moore "[didn't] have a full development and understanding of the fact here[.]" *Id.* at 182. But concedes he does not know what records Meaden & Moore was provided and fails to identify any additional financial records which Meaden & Moore needed to "understand" the issue. *Id.* at 182-83. From January

2022 onwards, his position was simply— Meaden & Moore cannot be right because he disagrees with the conclusion. *Id.* That is not an objectively reasonable belief of tax fraud.

*Second*, Plaintiff *never* sought a second opinion after he was, repeatedly, informed that his opinion was wrong by other professionals. (Biggins Depo., at 182). A "complaint" is not made on objectively reasonable belief where the employee's position has already been disproven. *Cf. Miller v. Abbott Labs.*, 648 Fed. App'x 555, 562 (6th Cir. 2016) (employee did not have an objectively reasonable belief that an FCA violation would occur where she knew the fraud would not occur); *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 404 (6th Cir. 2015) (no objectively reasonable belief where the employee "fail[ed] to conduct a sensible investigation" into the underlying matter). Like *Jones-McNamara*, Plaintiff failed to conduct a meaningful investigation. He failed to investigate the underlying law after he was presented with contrary opinions from the national accounting firm Meaden & Moore in January 2022. This point is amplified because "[i]n certain circumstances, a taxpayer can defeat a negligence penalty by proving reliance on his accountant's advice." *Losantiville Country Club v. Comm'r*, 906 F.3d 468, 476 (6th Cir. 2018) (internal quotations and citations omitted). NOMS' reliance on accountants – Meaden & Moore -- was *per se* reasonable. Conversely, Plaintiff's bald disagreement with the tax accountants, even after an exchange of information and points of concern, is not sufficient to form an objectively reasonable belief that a tax violation occurred. There is no case law stating an employee may entrench himself into an opinion – after being disproved by experts on the subject matter – and maintain an objectively reasonable belief without further investigating the applicable law.

*Third*, Plaintiff is unable to identify any law or regulation NOMS allegedly violated, claiming instead that NOMS violated "the tax laws" (*id.* at 174) and "IRC code sections that apply to all these things that we are talking about" (*id.* at 181). But when asked if he ever identified the

laws NOMS violated – he said "No," even in the face of contrary opinions from Meaden & Moore. *Id.* at 181. No case has found objectively reasonable belief where a plaintiff fails to conduct any investigation into the applicable law after his opinion is rebutted. Plaintiff's bare concerns are the exact type of general inquiries which do not rise to the level of protected activity under the TFA. *Tonra*, 405 F. Supp. 3d at 589-590 ("general inquiries do not constitute protected activity.").

*Fourth*, Plaintiff's theory that NOMS was evading taxes or defrauding the government is entirely hypothetical— not based on the actual financials. Plaintiff ***admits*** that he never analyzed whether NOMS was underpaying the government on taxes: "No, I never did the analysis." (Biggins Depo., 177-78). But most importantly – Plaintiff had no idea whether the existing partners at NOMS *ever* underpaid on taxes for the physicians being elevated to partner in the following year: *Id.* at 176-77 ("Q. Did [underpayment on taxes] ever happen? **A. So I mean, those things -- you don't have a crystal ball, you see?** Q. Did that ever happen? **A. Gosh, you know what—**"). Again, Plaintiff's failure to conduct an adequate investigation into whether NOMS' method *actually* resulted in shorting the government renders his opinions objectively unreasonable— especially in the face of contrary opinions from tax experts.

*Fifth*, the expert report of Gary Zwick on the issue of objective reasonableness is unrebutted, and plaintiff is not permitted to introduce expert opinions now. *See supra*, fn. 2. Zwick opined, "[t]hat he persisted not only after applying his own experience but after hearing from the Company CFO and the outside CPA firm appears to me to be entirely unreasonable . . . It is my opinion that Biggin's complaints were both subjectively and objectively unreasonable." (Doc. 21-1, at 5). Like *Jones-McNamara* and *Miller*, Plaintiff's inadequate investigative process *and* substantive conclusions are insufficient to constitute objective reasonableness. At most, Plaintiff can show he subjectively believed NOMS violated unidentified tax law; that is insufficient without

more. Plaintiff did not engage in protected activity, and therefore cannot satisfy a prima facie case.

*2. Plaintiff's Tax-Complaints were not a Contributing Factor to his Employment Termination.*

Plaintiff cannot satisfy the "contributing factor" prong of his prima facie case because the human resources investigation was walled off from the compliance committee.

The TFA incorporates a similar but "less burdensome" prima facie element to the "causal connection" prong applied in Title VII retaliation cases. *Gammons*, 91 F.4th at 827. "A contributing factor is any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision." *Miller v. Inst. for Def. Analyses*, 795 F. App'x 590, 597 (10th Cir. 2019). "For there to be causal connection between an adverse employment decision and a protected activity, the relevant decision-maker must have actual knowledge of the protected activity before making the decision." *Burns v. Mahle Engine Components USA, Inc.*, 605 F. App'x 522, 527 (6th Cir. 20215). Under the "contributing factor" standard, "an employee may establish a 'contributing factor' through the so-called knowledge/time test using circumstantial evidence, such as '(A) *the official taking the personnel action knew of the disclosure or protected activity*; and (B) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure or protected activity was a contributing factor in the personnel action." *McHugh v. VA*, 2023 U.S. App. LEXIS 9039, *7 (Fed. Cir.) (emphasis added). In *Wiest v. Tyco Elecs. Corp.*, the Third Circuit held a plaintiff could not satisfy this prima facie elements where the record showed that the individual "who conducted the investigation, had no knowledge of [plaintiff's] protected activity[.]" *Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 332 (3d Cir. 2016).

Harrington testified she was independently aware of complaints regarding Biggins' professionalism and behavior. (Harrington Depo., at 30-32). She stated that "[m]orale was low, so we were tasked with just, again, just getting a temperature and a feel for what was going on within

the department." *Id.* at 65. Opfer recused herself from the matter entirely. *Id.* at 64; Opfer Depo., at 154. And Spadaro was not involved in either the investigation or discussions regarding Biggins' termination: "Q: Were you involved in any discussions with Gio Spadaro about terminating Shawn Biggins? **A. No.**" (Harrington Depo., at 81). Harrington was never aware of the tax complaints. (Harrington Depo., at 29-30). None of the employees who, as discussed *infra*, made complaints about Biggins were aware of his tax complaints either. (Biggins Depo., at 137-38) ("Q: Were any of these individuals, Deno, Booker, Ostheimer or McRae, aware of your complaints? **A. No, none of them were. They had no idea about any of it.**"). At most, Harrington made the termination decision (Harrington Depo., at 20-21), which Spadaro accepted (Spadaro Depo., at 150).

Pursuant to *Wiest*, *McHugh*, and *Burns*— the tax complaint could not have been a contributing factor because the human resources investigation was walled-off and independent of the compliance committee. The termination recommendation and decision were made without input or direction from any individual with knowledge of the tax complaint. Plaintiff is thus unable to satisfy a prima facie case of retaliation

**B. There is clear and convincing evidence that NOMS would have terminated Plaintiff absent the tax complaint.**

Assuming *arguendo* that Plaintiff can satisfy a prima facie case, NOMS is still entitled to judgment because there is clear and convincing evidence that it would have terminated Plaintiff even if he had not complained about the tax practice.

The burden shifts to the employer if a plaintiff satisfies a prima facie case to "demonstrate[ ], by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior." 49 U.S.C. § 42121. "Clear and convincing is a high burden, but the defendants meet it [ ] by producing overwhelming and uncontroverted evidence that they terminated" the employee for legitimate, non-discriminatory reasons.

*Gammons*, 91 F.4th at 828. In *Gammons*, the plaintiff reported the company to the IRS. But, simultaneously, "attempted [a] coup" to "manipulat[e] a legal process to effectuate a hostile takeover" of the company. *Id.* The Sixth Circuit concluded "[t]he attempted coup itself sufficiently motivated the defendants to get Scott out of the business; *the IRS reporting was just icing on the cake.*" *Id.* (emphasis added). "Icing on the cake" is insufficient to overcome clear and convincing evidence that an employment action would have taken place regardless of the protected activity. *Id.*

The evidence that Plaintiff was terminated without consideration of the tax complaint is overwhelming. NOMS' Rules of Conduct, which Plaintiff signed acknowledgement of receiving, provides that "[f]ollowing are some, but not all reasons, for counseling and/or discharge of employees." (Biggins Depo., at 54). Those rules go on to identify: "Threatening, intimidating, bullying, coercing, directing abusive language and/or behavior to others or interfering with others on NOMS premises."; "Refusal to follow a manager's, supervisor's or any representative of management's instructions."; "Creating disharmony and/or interfering with another employee's efforts to meet NOMS work standards." *Id.* at 54-55.

*First*, Opfer and Williams planned to terminate Plaintiff before either learned of the tax complaint due to his refusal to meet with the CEO, CFO, and CHRO in November 2022. Spadaro and Opfer emailed Plaintiff requesting his availability to meet and finalize the counseling. (Biggins Depo., at 87). Opfer emailed Plaintiff on November 16, 2022, stating "We have scheduled this meeting on November 30th at 10:00 a.m. Your attendance is required[.]" (Biggins Depo., at 87). Plaintiff refused on November 17, 2022, responding: "Hi again, Sorry but I have my own meetings on this matter scheduled that week that I cannot reveal and so I cannot make the meeting on 11-30." *Id.* at 88. On November 21, 2022, Opfer stated Plaintiff would need to meet with her and

NOMS' CEO, Josh Frederick. *Id.* at 90. Plaintiff refused *again* on November 28, 2022, stating "No thank you Sarah. This is a Board level matter." *Id.* That is a clear violation of NOMS policy. *Id.* at 55. Accordingly, Opfer drafted a termination letter which was only withheld *because Plaintiff raised the tax issue*. (Opfer Depo., at 84-85) ("We were making the – . . . to get to a termination . I thought we were going to terminate him. And then he brought up tax evasion and fraud and like a compliance issue, and Ryan stopped the call immediately[.]"). It was the tax complaint in the face of discipline that initially saved his job, not the opposite.

*Second*, as discussed *supra*, all individuals with knowledge of the tax complaint were walled-off from Harrington's investigation. (Harrington Depo., at 81). That investigation showed Plaintiff created a hostile work environment for his direct reports and peers. Harrington's investigation revealed one of the employee's Plaintiff supervised felt "micromanaged," "poorly managed," Plaintiff was "consistently late for meetings he would schedule or just not show up," and that "the work environment and communication is 'strained'" under Plaintiff's leadership. (Biggins Depo., at 126). Another interview showed: "If Rob and Shawn [Plaintiff] disagree about anything Shawn displays a temper and even yells at him. Rob said he has displayed a temper at times, going back a few years." *Id.* at 130. And, "Shawn had an episode when they were meeting with [a vendor] Avid and he started screaming, and then almost immediately he was remorseful almost to the point of crying, I'm almost sure he did have tears, directly in the meeting[.]" *Id.* at 130.

A coworker provided information that "[Plaintiff's] emails she feels he uses words like 'Superwoman' or pictures that are unnecessary and demeaning towards women and he only uses them 'regarding women.'" *Id.* at 116. And "you can tell in his email that [Plaintiff] doesn't respect women. Lastly, she did mention that she used to frequently hear Shawn yelling at Rob McRae."

*Id.* Another employee's interview provided "Becky started the meeting by stating she 'has not worked side by side with SB for over a year because I simply cannot work with him.' . . . she stated he always tried to make her feel less than or beneath him in the past or that her time was not as valuable." *Id.* at 121. And, "how she does not feel comfortable working for him[.]" *Id.* at 122.

Prohibited conduct includes "[t]hreatening, intimidating, bullying, coercing, directing abusive language and/or behavior to others or interfering with others on NOMS premises" and "[c]reating disharmony and/or interfering with another employee's efforts to meet NOMS work standards." *Id.* at 54-55. There is no fair reading of Harrington's investigative file which would lead to a conclusion other than an overwhelming demonstration that Plaintiff violated NOMS' policies many times over. *Id.* He was not only an ineffective leader, but more than that, was a bully to those he worked with.

Harrington made the decision to terminate Plaintiff based on her investigation alone. (Harrington Depo., at 20-21). The investigation could not have been contaminated by the tax issue because neither Harrington nor the interviewees knew of the tax complaint. (Biggins Depo., at 137-38); (Harrington Depo., 28-29). On January 26, 2023, Harrington made the decision that termination of Plaintiff was appropriate based on that investigation. (Harrington Depo., at 20-21). Spadaro accepted Harrington's termination of Plaintiff. *Id.* at 81. And on February 7, 2023, Spadaro and HR generalist Feldmann effectuated the termination decision made by Harrington. (Spadaro Depo., at 143-44).

The record demonstrates clear and convincing evidence that Plaintiff was terminated without any regard to his tax complaint. It certainly establishes the termination would have occurred in the absence of the tax issue. Plaintiff therefore cannot sustain a claim to overcome summary judgment.

## IV. CONCLUSION

Northern Ohio Medical Specialists, LLC respectfully requests this Court grant judgment in its favor because Plaintiff cannot sustain a prima facie case of retaliation, and was otherwise terminated for a legitimate, non-discriminatory reason.

Respectfully submitted,

*/s/ David R. Hudson*
David R. Hudson (0084988)
Jorden R. Messmer (0102652)
Reminger Co., L.P.A.
One SeaGate, Suite 1600
Toledo, Ohio 43604
Telephone: 419-254-1311
Facsimile: 419-243-7830
*dhudson@reminger.com*
*jmessmer@reminger.com*
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

A copy of the foregoing has been forwarded via E- Mail on this 15th day of December, 2025 to the following:

Fred M. Bean
Spitz, the Employee's Law Firm
25825 Science Park Drive, Suite 200
Beachwood, Ohio 44122
fred.bean@spitzlawfirm.com

Counsel for Plaintiff

*/s/ David R. Hudson*
David R. Hudson (0084988)