IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| SHAWN BIGGINS,<br><br>Plaintiff,<br><br>v.<br><br>NORTHERN OHIO MEDICAL SPECIALISTS, LLC<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 3:23-cv-1917<br><br>JUDGE JAMES R. KNEPP II |

---

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

**(ORAL ARGUMENT REQUESTED)**

Respectfully submitted,

*/s/ Fred M. Bean*

Fred M. Bean (0086756)
**SPITZ, THE EMPLOYEE'S LAW FIRM**
3 Summit Park Drive, Suite 200
Independence, OH 44131
Phone: (216) 291-4744
Fax: (216) 291-5744
Email: Fred.Bean@SpitzLawFirm.com

*Attorney for Plaintiff Shawn Biggins*

## TABLE OF CONTENTS


**TABLE OF AUTHORITIES** .......... iv

**I. SUMMARY OF CASE AND MATERIAL FACTS** .......... 1

**A. Case Summary** .......... 1

**B. Biggins Is A CPA With Nearly 30 Years Of Tax And Accounting Experience** .......... 1

**C. Biggins' Hiring And Background On NOMS** .......... 1

**D. Near The End Of 2021, Biggins Suspected And Reported That NOMS Was Violating IRS Tax Laws With Respect To Handling Income Earned In 2021** .......... 3

**E. Biggins Raises His Tax Fraud Complaints Again In Mid-2022** .......... 5

**F. In November 2022, NOMS Disciplines Biggins For The First Time In His Career** .......... 6

**G. NOMS, Specifically Opfer And Spadaro, Consult With The Company's Accounting Firm, However, At No Time Do They Allow Biggins To Address His Concerns Directly** .......... 7

**H. Around Mid-December 2022, Biggins Again Expresses His Same Tax Fraud Concerns, Resulting In Spadaro Starting To Paper Biggins' File** .......... 8

**I. After Biggins Lodges A Complaint With Opfer That He Is Being Retaliated Against, He Is Terminated Three Days Later** .......... 9

**II. SUMMARY JUDGMENT STANDARD** .......... 11

**III. DEFENDANT CANNOT ERASE ALL GENUINE ISSUES OF FACT AS TO BIGGINS' TAXPAYER FIRST ACT CLAIM** .......... 11

**A. Elements And Legal Standards** .......... 11

**B. Biggins Has Met His Prima Facie Case At The Summary Judgment Stage** .......... 12

1. *Biggins Engaged In Protected Activity Under The TFA* .......... 12

2. *Biggins Had A Reasonable Belief That His Complaints Were Accurate And Correct* .......... 14

3. *Even Though Not Required, The Evidence In The Record Supports The Conclusion That Biggins' Complaints Were Not Simply Reasonable, They Were Correct* .......... 17

**C. There Is Fact Dispute That Biggins' Complaints Were A Contributing Factor To His Termination** .......... 19

**D. NOMS Cannot Meet The High Burden Of Showing By Clear And Convincing Evidence That It Would Have Terminated Biggins Absent His Complaints** .......... 22

**IV. CONCLUSION** .......... 25

**CERTIFICATE OF COMPLIANCE WITH L.R. 7.1(f) AND REQUEST FOR ORAL ARGUMENT UNDER L.R. 7.2(b)** .......... 26

**CERTIFICATE OF SERVICE** .......... 26

## TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505 (1986) ........ 11

*Bishop v. Ohio Dept. of Rehab. & Corr.,* 529 Fed.Appx. 685 (6th Cir. 2013) ........ 24

*Bluegrass Dutch Tr. Morehead, LLC v. Rowan Cnty. Fiscal Ct*., 734 Fed.Appx. 322 (6th Cir. 2018) ........ 25

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548 (1986) ........ 11

*Consolidated Rail Corp. v. U.S. Dept. of Labor*, 567 Fed.Appx. 334 (6th Cir. 2024) ........ 20

*Daily Press, Inc. v. United Press Int'l*, 412 F.2d 126 (6th Cir. 1969) ........ 25

*Disner v. Westinghouse Elec. Corp*., 726 F.2d 1106 (6th Cir. 1984) ........ 23

*Hancock v. Dodson*, 958 F.2d 1367 (6th Cir. 1992) ........ 11

*Hand v. CSX Transportation, Inc.*, 2021 WL 963584 (S.D. Ohio) ........ 20

*Indiana Mich. Power Co. v. U.S. Dep't of Labor*, 278 Fed.Appx. 597 (6th Cir. 2008) ........ 20

*Lemon v. Norfolk So. Ry. Co*., 958 F.3d 417 (6th Cir. 2020) ........ 20

*Ma v. American Elec. Power Inc.*, 123 F.Supp.3d 955 (W.D. Mich. 2015) ........ 20

*Murray v. UBS Securities, LLC,* 601 U.S. 23, 144 S.Ct. 445 (2024) ........ 12, 19, 20

*Rheinecker v. Forest Laboratories, Inc.,* 813 F.Supp. 1307 (S.D. Ohio 1993) ........ 13

*Rhinehimer v. U.S. Bancorp Investments, Inc.,* 787 F.3d 797 (6th Cir. 2015) ........ 14, 15

*Stone & Webster Eng. Corp. v. Herman*, 115 F.3d 1568 (11th Cir. 1997) ........ 20

*Sylvester v. Parexel Int'll LLC*, 2011 WL 2165854 (ARB 2011) ........ 14

*Turnbow-Avery v. Tuling*, 2025 WL 2051758 (S.D. Ohio) ........ 25

*United States v. Barnwell,* 2021 WL 1964261 (N.D. Ohio) ........ 23

*United States v. Beard*, 528 F.Supp.3d 764 (N.D. Ohio 2021) ........ 23

**STATUTES AND REGULATIONS**

26 C.F.R. § 1.451-2 .......... 19

26 U.S.C. § 7623(d) .......... 1, 11, 12, 14

49 U.S.C. § 42121(b) .......... 11, 12

## I. SUMMARY OF CASE AND MATERIAL FACTS

### A. Case Summary.

This case concerns a single claim by Plaintiff Shawn Biggins that his former employer, Defendant Northern Ohio Medical Specialists, LLC ("NOMS"), violated the anti-retaliation provision of the Taxpayer First Act ("TFA"), 26 U.S.C. § 7623(d)(1), after Biggins, as the company's Controller and licensed Certified Public Accountant ("CPA"), reported suspected tax law violations. There is no dispute between the parties that Biggins made these reports, which were protected activity under the TFA. There is no dispute that after he made these reports, he was subjected to disciplinary action and eventually terminated from his employment. Based on his experience, and the evidence cited herein, Biggins had a reasonable basis to make his complaints, and at the summary judgment stage, NOMS cannot satisfy the demanding "clear and convincing evidence" standard required under the TFA for dismissal of Biggins' claim. Rather, there are genuine factual disputes between the parties as to one or more elements of Biggins' claim, and therefore the Court should deny summary judgment.

### B. Biggins Is A CPA With Nearly 30 Years Of Tax And Accounting Experience.

Biggins obtained a college degree in accounting in 1995 and has been an Ohio-licensed CPA since 2006.[1] Since college, Biggins has held a number of professional positions in tax and accounting.[2] This includes holding an Auditor and Senior Tax CPA position with an accounting firm from 2007 through 2011, followed by a CPA and Accountant position with Firelands Physicians Group from 2012 through 2015.[3] Thereafter, Biggins spent around six years as a Staff Accountant and Controller with NOMS from 2017 to 2023. Finally, since his termination from NOMS, Biggins has worked directly for the IRS as an Internal Revenue Agent.[4]

### C. Biggins' Hiring And Background On NOMS.

NOMS hired Biggins around January 2017 as the company's Staff Accountant, and then about a year later in 2018, he was promoted to Controller.[5] Between 2017 and 2020, Biggins received three different annual

---

[1] Biggins Depo. @ 10-11 (Excerpts filed as Exhibit 2); Exhibit 1: Biggins Declaration @ ¶ 1.
[2] Exhibit 1: Biggins Declaration @ ¶ 1. *See* Exhibit 1-B Resume.
[3] Exhibit 1: Biggins Declaration @ ¶ 1.
[4] Exhibit 1: Biggins Declaration @ ¶ 1.
[5] Biggins Depo. @ 56-57; Exhibit 1: Biggins Declaration @ ¶ 2.

performance reviews and received "meets expectations" scores for all three reviews.[6] In all three reviews, Biggins received praise and for his teamwork and leadership, with no negative comments in those categories.[7]

As the Controller, Biggins "planned and directed accounting operations" at NOMS, which included a number of essential duties, such as: (1) overseeing the production of periodic financial reports, (2) providing financial analyses for the company, and (3) working with external auditors for any annual company audits.[8] Moreover, one of Biggins' duties included, "managing and complying with local, state and federal government reporting requirements and tax filings."[9]

NOMS is a multi-specialty physician group that essentially employs physicians, typically starting out on a W2-employee basis – meaning the physician works as an employee of the company.[10] After a certain period of time, the physician may become a "partner" of NOMS, which among other things, results in the physician's tax structure changing, from a W2 employee to a K-1 partner.[11] The latter is akin to someone who is "self-employed" meaning that NOMS does not withhold any taxes, deductions, etc. from the physician's paycheck or yearly income—rather, the physician, much like a 1099 contractor, would receive the entire gross amount of income and then be responsible for his/her own taxes and deductions.[12]

Importantly, the **tax consequences are different** for a W2 versus a K-1, largely because in a W2 scenario, the employer controls the withholdings, deductions and taxes that are taken out up front.[13] Conversely, for a K-1, the physician has complete control, not only over the taxes paid from that gross income, but also control over all deductions – i.e. deducting business expenses, which are not available for a W2 employee.[14] Thus, in the latter scenario, even NOMS' CEO, Josh Frederick, acknowledged that he would expect to see significant variation among different K-1 physicians' tax filings (to account for different choices for deductions,

---

[6] Plaintiff's Depo. Ex. 6, 7, 8. (Plaintiff's Deposition Exhibits 1-55 filed together as Exhibit 8).
[7] *Id.*; Exhibit 1: Biggins Declaration @ ¶ 3.
[8] Plaintiff Depo. Ex. 5.
[9] *Id.*; Exhibit 1: Biggins Declaration @ ¶ 4.
[10] Exhibit 1: Biggins Declaration @ ¶ 5.
[11] Exhibit 1: Biggins Declaration @ ¶ 5.
[12] Exhibit 1: Biggins Declaration @ ¶ 5.
[13] Exhibit 1: Biggins Declaration @ ¶ 6; Frederick Depo. @ 39-40 (Excerpts filed as Exhibit 4).
[14] Exhibit 1: Biggins Declaration @ ¶ 6; Frederick Depo. @ 39-40.

business expenses, contributions to retirement or other financial accounts, etc.), versus those same physicians being employed and paid as a W2 employee.[15] Moreover, NOMS' CFO, Gio Spadaro likewise admitted that W2 employees "cannot deduct business expenses" as a way to lower their adjusted gross income (thus, less taxes), but a K-1 partner can do exactly that (i.e. receive tax benefits by lowering their "income" through expense deduction).[16]

### D. Near The End Of 2021, Biggins Suspected And Reported That NOMS Was Violating IRS Tax Laws With Respect To Handling Income Earned In 2021.

Part of Biggins' duties throughout the year, and at year's end, was to prepare and review financial statements for the physicians.[17] Around January 2022, Biggins' supervisor, Spadaro told him to "rerun" the full year 2021 financial statements that Biggins had reviewed and submitted.[18] After doing so, Biggins then reviewed those new statements, and he came across a new entry from Spadaro in their internal accounting system – this entry noted that NOMS was erasing $728,138.52 of income from 2021 and "crediting" that income for 2022 instead.[19] The line-item entry showed that this practice was being done for several physicians, including Dr. Fahim for the total amount of $344,538.78.[20] This immediately raised an alarm for Biggins because these same physicians had all been W2 employees in 2021 and were switching to K-1 partners starting in January 2022.[21] Thus, any income earned by the physicians in 2021 would have different tax consequences versus income earned in 2022 as a K-1 partner.[22]

To simplify this for one physician, Dr. Fahim, Spadaro's entry showed the following: first, that Dr. Fahim had a pool of income, $344,538.78, that he had earned *throughout* the 2021 calendar year.[23] This income would be expressed through a monthly financial statement that was prepared for each physician on a rolling

[15] Frederick Depo. @ 39-40.
[16] Spadaro Depo. @ 58-59, 66-67. (Excerpts filed as Exhibit 3).
[17] Exhibit 1: Biggins Declaration @ ¶ 4.
[18] Exhibit 1: Biggins Declaration @ ¶ 7.
[19] Plaintiff Depo. Ex. 9; Exhibit 1: Biggins Declaration @ ¶ 7.
[20] Plaintiff Depo. Ex. 9.
[21] Exhibit 1: Biggins Declaration @ ¶ 7.
[22] Exhibit 1: Biggins Declaration @ ¶ 7.
[23] Exhibit 1: Biggins Declaration @ ¶ 8; Exhibit 1-A (attached to declaration).

monthly basis.[24] Exhibit 1-A is an illustration of this breakdown for Dr. Fahim. It shows a month-to-month breakdown for 2021 for Dr. Fahim's income, reflected after expenses.[25] Each month, the "net" income available to the physician is reflected in the last row, called the "Ending Holdback Account." ("EHA").[26] Essentially, this is akin to a bank account of sorts, meaning the EHA shows either a surplus or deficit, *each month*, for the physician.[27] The physician, per their compensation agreement with NOMS, can then either withdraw that money, subject to a minimum EHA balance, or simply leave it in the account and withdraw it later.[28] Either way, the physician has **earned** that money – it is *their* money, *their* income.[29]

So, in Spadaro's entry, a total amount of $344,538.78 for Dr. Fahim was debited from his 2021 W2 – meaning Dr. Fahim paid no tax or withholdings on that money for the 2021 tax year.[30] Instead, NOMS moved that income, *earned* in 2021, over to 2022, whereby at that point, Dr. Fahim would be a K-1 partner.[31] Thus, in 2022, Dr. Fahim received a "credit" in the amount of $344,538.78, income of which was no longer subject to W2 withholdings, and income that was now available to Dr. Fahim to use for business expense deductions, financial account contributions, or other tax maneuvers by the K-1 partner, as eligible under the IRS code.[32] NOMS did this for Dr. Fahim, and several more physicians, totaling over $728,138 that vanished from those physicians' W2s, and instead was credited in 2022 as K-1 income.[33]

Upon reviewing this entry, on or about January 18, 2022, Biggins reported the issue to Spadaro during their next pre-set weekly meeting, which took place every Tuesday.[34] At first, Biggins merely tried to educate Spadaro, who is not a licensed CPA, by telling him "I don't think he understood what he did" relative to erasing

---

[24] *Id*.
[25] *Id*.
[26] *Id*.
[27] *Id*.
[28] *Id*.
[29] *Id*.
[30] Exhibit 1: Biggins Declaration @ ¶ 9; Plaintiff's Depo. Ex. 9.
[31] *Id*.; Frederick Depo. @ 33-35; Spadaro Depo. @ 52-53.
[32] *Id*.; Frederick Depo. @ 33-35; Spadaro Depo. @ 52-53.
[33] Exhibit 1: Biggins Declaration @ ¶ 9.
[34] Exhibit 1: Biggins Declaration @ ¶ 10; Spadaro Depo. @ 51-52, 78.

that 2021 income, and crediting it to 2022.[35] Biggins told Spadaro that this conduct was fraudulent and that the statements should be reran again to correct it because NOMS could not take earned income from 2021 and remove it from the physicians' W2s, allowing them to avoid 2021 taxes related to that income.[36] Spadaro rejected Biggins' report, taking the position that the income was paid in 2022 due to a "timing" issue regarding when it was payable.[37] After Biggins' initial report, Spadaro then cancelled their next several Tuesday meetings and seemed to attempt to avoid any further discussion with Biggins about his tax fraud report.[38] As a result, the issue essentially went nowhere and was not otherwise investigated by NOMS at that time.[39]

### E. Biggins Raises His Tax Fraud Complaints Again In Mid-2022.

In June 2022, Biggins received another annual review, and again it was positive, especially in the areas of Team Work and Leadership where Biggins received praise for his teamwork, his communication, and leadership of his department.[40] Once again, Biggins did not receive a single negative remark about his interaction with other employees in the 2022 review.[41] In the employee comments section of his June 2022 review, Biggins wrote the following:

> **I have concerns on some things as far as Tax Laws not being followed according to my recommendations as well as some accounting practices that need changed**. These items need changed going forward for sure. I will continue to communicate what we should do however it remains to be seen if these things are truly followed or not.[42]

Spadaro was aware of Biggins' comments and knew they related back to his original report in early 2022 about NOMS' handling of the 2021-2022 W2 to K-1 switch where 2021 income was debited from physician W2s and credited on their K-1s for 2022.[43] Biggins followed this up with further emails in July 2022 wherein he discussed his annual review and noted that he still had concerns that needed to be addressed,

---

[35] Biggins Depo. @ 67. Exhibit 1: Biggins Declaration @ ¶ 10.
[36] Exhibit 1: Biggins Declaration @ ¶ 10.
[37] Spadaro Depo. @ 62-63. Exhibit 1: Biggins Declaration @ ¶ 10; Notably, Defendant's own proposed expert, Gary Zwick, rejects Spadaro's position that NOMS' conduct was due to a "timing" issue. *See* Plaintiff Depo. Ex. 54 (Zwick Report @ 4).
[38] Plaintiff Depo. Ex. 10, 11.
[39] Exhibit 1: Biggins Declaration @ ¶ 10.
[40] Plaintiff's Depo. Ex. 12.
[41] *Id*.; Exhibit 1: Biggins Declaration @ ¶ 11.
[42] *Id*. (**Emphasis** added); Exhibit 1: Biggins Declaration @ ¶ 11.
[43] Spadaro Depo. @ 77-78.

including the "primary tax issue that has happened in 2021 and in 2022 within NOMS and is a major concern."[44] Again, Spadaro did not address the issue and instead asked "what tax issue" Biggins was referring to.[45] Spadaro then forwarded these emails to Sarah Opfer, NOMS' HR manager.[46]

### F. In November 2022, NOMS Disciplines Biggins For The First Time In His Career.

In the months following Biggins' renewed reports to NOMS regarding suspected tax law violations, he was disciplined for the first time in his six-year career on November 2, 2022.[47] Specifically, Opfer and Spadaro issued Biggins a Formal Reminder counseling form, which was thereafter changed to a Record of Conversation because NOMS admittedly skipped that progressive disciplinary step.[48] In this disciplinary action, Biggins was accused of "lack of leadership" and "communication issues" with his fellow employees – again, none of which had ever been mentioned or brought up in any of his prior annual reviews.[49] This is true even though Biggins' write-up accused him of issues related to lack of leadership and poor communication "since the pandemic."[50]

By this point, feeling targeted for his prior protected activity, Biggins took steps to escalate his tax fraud complaints, asking for a meeting with NOMS' Board in late November 2022 so that he could address these concerns directly with the Board.[51] As a reaction to this, NOMS set up a discussion with Biggins on November 29, 2022, via video conference.[52] At this meeting, NOMS originally intended to terminate Biggins' employment and even prepared a termination letter to that effect.[53] However, during this meeting, when NOMS' representatives (Spadaro, Opfer and Ryan Williams) brought up Biggins "being fired," Biggins immediately responded and said that NOMS would be wrongfully terminating him based on his complaints that NOMS was engaging in tax fraud surrounding the evasion of taxes for the 2021 year.[54] Opfer testified that

---

44 Plaintiff Depo. Ex. 14; Exhibit 1: Biggins Declaration @ ¶ 11.
45 Plaintiff Depo. Ex. 14.
46 *Id*.
47 Plaintiff Depo. Ex. 16; Exhibit 1: Biggins Declaration @ ¶ 12.
48 Plaintiff Depo. Ex. 16 and compare to Plaintiff Depo. Ex. 2; Exhibit 1: Biggins Declaration @ ¶ 12.
49 *Id.*
50 *Id.*
51 Plaintiff Depo. Ex. 17; Exhibit 1: Biggins Declaration @ ¶ 13.
52 Exhibit 1: Biggins Declaration @ ¶ 13.
53 Plaintiff Depo. Ex. 22.
54 Exhibit 1: Biggins Declaration @ ¶ 13; Opfer Depo. @ 36-37. (Excerpts filed as Exhibit 5).

when Biggins raised this issue during the call, this was the first time "she had learned" about Biggins' tax fraud complaints (Spadaro had not previously informed her).[55]

As a result, Biggins requested a compliance meeting to further discuss and investigate his concerns and Opfer told him it would be done.[56] However, Josh Frederick, the CEO, quickly informed Opfer via email that if such a meeting was held, he wanted to be there to "start poking holes" in Biggins' position regarding his tax fraud concerns.[57] Frederick further stated that "it bothers me that our controller is saying, 'I don't like the direction of the company'", and expressly told Opfer, "I don't want him to go down a CPA-related rabbit hole without correcting and poking holes in his 'compliance' concerns."[58]

### G. NOMS, Specifically Opfer And Spadaro, Consult With The Company's Accounting Firm, However, At No Time Do They Allow Biggins To Address His Concerns Directly.

Over the next month, Biggins resubmitted his tax fraud concerns as it related to the 2021-2022 zero-out entry from Spadaro that effectively erased over $728,000 of physician income from 2021 and moved it over to 2022, after changing their tax structure to K-1.[59] However, Biggins was only allowed to submit his concerns to Spadaro (who is not a CPA) and Opfer (who has no tax-related education or experience at all).[60] From there, Opfer and Spadaro claim they had communications with Brent Thompson, a CPA from Meaden & Moore, NOMS' accounting firm.[61] This resulted in a back-and-forth, whereby Opfer exchanged information from Biggins to Meaden and vice versa; however, at no point was Biggins allowed to simply have a direct discussion with Thompson – one licensed CPA to another.[62] This resulted in information getting lost in translation and the reality that Meaden potentially never really understood the full extent of Biggins' complaints.[63]

---

[55] Opfer Depo. @ 36-37.
[56] Exhibit 1: Biggins Declaration @ ¶ 13; Plaintiff Depo. Ex. 23.
[57] Plaintiff Depo. Ex. 24.
[58] *Id.*
[59] Exhibit 1: Biggins Declaration @ ¶ 14.
[60] Exhibit 1: Biggins Declaration @ ¶ 14; Opfer Depo. @ 40-41; Spadaro Depo. @ 11.
[61] Opfer Depo. @ 100; Spadaro Depo. @ 111-112.
[62] Exhibit 1: Biggins Declaration @ ¶ 14; Opfer Depo. @ 107-108.
[63] Exhibit 1: Biggins Declaration @ ¶ 14.

For instance, in a report authored by Thompson on December 5, 2022, he essentially agrees with Spadaro that the reason this income "had to be" pushed into 2022 was due to a "timing" issue – meaning the exact sum payable was not known until January 2022.[64] However, this logic was flawed and missed the entire point of Biggins' complaint because it assumed that this physician income was *only* from December 2021.[65] However, that was not the case, as Biggins explained and showed Spadaro – the financial statements for the physicians in question were from **the entire year**, meaning all 12 months.[66] This is precisely why NOMS' own purported expert, Gary Zwick, agreed that "it is not a timing issue."[67]

### H. Around Mid-December 2022, Biggins Again Expresses His Same Tax Fraud Concerns, Resulting In Spadaro Starting To Paper Biggins' File.

On December 9, 2022, Biggins again put his concerns in writing, as part of his rebuttal to his earlier Record of Conversation, stating:

> I have stated my 'actual examples' with the compliance committee for an investigation to be made over concerns of Federal, State and City Tax Laws being recklessly broken possibly with an intent to deceive in a long-term pattern of tax-aggressiveness that has gone too far with the 2021 and possibly 2022 Financials and K-1's. I have also experienced an extreme abuse of power directly pointed at me because of myself not agreeing with this type of attitude towards following the tax and accounting laws required in this country at NOMS.[68]

Around this same time, Spadaro began sending Opfer several emails for a new "Shawn file" whereby he accused Biggins of alleged performance issues.[69] Moreover, throughout December 2022 and into January 2023, Opfer and Spadaro continued to act as a go-between for Biggins and Thompson regarding Biggins' tax-related complaints.[70] In one memo from Thompson, he admits that "Tax law requires that NOMS pay tax on revenue they collected **during the year**, whether earned by employed physician" and that "the NOMS partnership is **not permitted to defer this income for tax purposes to the following year**."[71]

---

[64] Plaintiff Depo. Ex. 27 (see page 1 and 3).
[65] Exhibit 1: Biggins Declaration @ ¶ 15.
[66] Exhibit 1: Biggins Declaration @ ¶ 15; See e.g. Exhibit 1-A.
[67] Plaintiff's Depo. Ex. 54 (Zwick Report).
[68] Plaintiff Depo. Ex. 28; Exhibit 1: Biggins Declaration @ ¶ 16.
[69] *See* Plaintiff Depo. Ex. 29, 33, 34, 42, 43.
[70] *See* Plaintiff Depo. Ex. 30, 31, 37, 38, 39; Exhibit 1: Biggins Declaration @ ¶ 17.
[71] Plaintiff Depo. Ex. 38. Thompson's admission, while significant, still only addresses half of Biggins' concern and does not address the fact that the income in each physician's Ending Holdback Account from January through December 2021 was

This culminated in another threatening email from Frederick on January 4, 2023 wherein he stated:

> I understand Shawn has expressed concerns, and maybe there have been discussions with him through the compliance process, but I also need to run a business, and I need my controller to know he reports to the CFO, and **not to question approved and legitimate methodologies, just because he all of a sudden has concerns or has a different perspective**.[72]

In the same email, Frederick then states that he "will have a **short leash for someone who** simply doesn't understand business and/or **is a disruption** to such a critical function of our team and where we are headed."[73]

## I. After Biggins Lodges A Complaint With Opfer That He Is Being Retaliated Against, He Is Terminated Three Days Later.

On January 23, 2023, during a discussion with Opfer, Biggins reported that he "felt he was being retaliated against by his boss, CFO [Spadaro]."[74] Opfer never investigated this complaint, nor took any other action to address it.[75] From there, Biggins' removal escalated very quickly. Indeed, in an email from Mia Feldman (an HR Manager), dated January 26, 2023, she stated:

> On Thursday, January 26, 2023, Sarah Opfer, CHRO, approached Erika Harrington, HR Director and me, HR Manager asking if we could review the documentation regarding Shawn Biggins. Sarah asked us to determine the next corrective action steps for Shawn and recused herself.[76]

So according to Feldman, she and Harrington were approached for the first time by Opfer on January 26, 2023 asking them to "review some documentation" regarding disciplining Biggins.[77] Surprisingly, Harrington disagrees with Feldman's statements and testified that she and Feldman had been asked "earlier" than January 26 to look into concerns regarding Biggins.[78] Regardless of their credibility as to the date, it was not until January 26, 2023 that Harrington suddenly took action and sent several emails to Biggins' coworkers and subordinates, whereby **Harrington, herself, wrote a statement for each of them, in her own words**, and simply asked each employee to review and agree to it.[79] Amazingly, Harrington did the following:

---

constructively received by them – meaning, pursuant to 26 CFR § 1.451-2, the physicians had "earned" that income for tax purposes, yet, they paid no tax on it.

[72] Plaintiff Depo. Ex. 35. (**Emphasis** added).
[73] *Id*. (**Emphasis** added).
[74] Plaintiff Depo. Ex. 40; Exhibit 1: Biggins Declaration @ ¶ 18; Opfer Depo. @ 146-148.
[75] Opfer Depo. @ 148-149.
[76] Plaintiff Depo. Ex. 47.
[77] *Id*.
[78] Harrington Depo. @ 61-62. (Excerpts filed as Exhibit 6).
[79] Plaintiff Depo. Ex. 44, 45, 46, 48.

- On January 26, 2023 at 10:22 am, she drafted and emailed Rebecca Booker Harrington's written statement, got Booker to agree to it 4 minutes later and then emailed it to Spadaro within the same hour at 10:52 am.[80]
- On January 26, 2023 at 10:20 am, she drafted and emailed Diane Deno Harrington's written statement, to which Deno responded 5 minutes later, "That's fine. I don't want to be mean to him in any way because I have done some things wrong too."[81] When Harrington was asked whether she followed up with Deno about her qualifying comment or made any changes to the written statement as a result, her answer was "no."[82] Instead, Harrington just forwarded it to Spadaro at 10:51 am.
- On January 26, 2023 at 10:27 am, she drafted and emailed Shawna Taylor Harrington's written statement, to which Taylor too responded and offered feedback, including corrections to errors in the statement. Again, Harrington did not correct the statement, resend it to Taylor, or take any other action other than simply forwarding it to Spadaro at 10:52 am.[83]

Within about **one-half hour** later, at 11:14 am, Feldman sent the email to Opfer, Harrington and Spadaro regarding the decision to terminate Biggins' employment.[84] In fact, this was so rushed that the termination email was sent 20 minutes **before** Harrington even received a response from the other employee she emailed a written statement to, Kylie Ostheimer, which came through at 11:34 am.[85] Again, Ostheimer's response included several corrections, edits and other comments in response to Harrington's written statement that she had sent earlier at 10:24 am.[86] Yet, not only was this statement not amended or appropriately updated, NOMS did not even wait for it before terminating Biggins' employment.[87]

Thereafter, on February 7, 2023, NOMS officially informed Biggins of his termination.[88]

[80] Plaintiff Depo. Ex. 44.
[81] Plaintiff Depo. Ex. 45.
[82] *Id*.; Harrington Depo. @ 51.
[83] Plaintiff Depo. Ex. 46; Harrington Depo. @ 54-55.
[84] Plaintiff Depo. Ex. 47. Notably, at no point did Harrington ever speak with Biggins prior to his termination. *See* Harrington Depo. @ 73-74. *See* Exhibit 1: Biggins Declaration @ ¶ 19.
[85] Plaintiff Depo. Ex. 48.
[86] *Id*.
[87] Compare Plaintiff Depo. Ex. 47 and 48.
[88] Plaintiff Depo. Ex. 50.

## II. SUMMARY JUDGMENT STANDARD

The moving party bears the initial burden of informing the district court of the basis for its motion.[89] Summary judgment shall be denied "[i]f there are ...'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'"[90] A court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party.[91] Finally, if the parties present conflicting evidence, a court may not decide which evidence to believe by deciding which parties' affiants are more credible; rather, credibility determinations must be left to the jury.[92]

## III. DEFENDANT CANNOT ERASE ALL GENUINE ISSUES OF FACT AS TO BIGGINS' TAXPAYER FIRST ACT CLAIM.

### A. Elements And Legal Standards.

The Taxpayer First Act provides in relevant part:

> (1) ANTI-RETALIATION WHISTLEBLOWER PROTECTION FOR EMPLOYEES. No employer, or any officer, employee, contractor, subcontractor, or agent of such employer, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment (including through an act in the ordinary course of such employee's duties) in reprisal for any lawful act done by the employee—
>
> (A) **to provide information, cause information to be provided, or otherwise assist in an investigation regarding underpayment of tax or any conduct which the employee reasonably believes constitutes a violation of the internal revenue laws or any provision of Federal law relating to tax fraud**, when the information or assistance is provided to the Internal Revenue Service, the Secretary of the Treasury, the Treasury Inspector General for Tax Administration, the Comptroller General of the United States, the Department of Justice, the United States Congress, **a person with supervisory authority over the employee, or any other person working for the employer who has the authority to investigate, discover, or terminate misconduct**.[93]

Using the same requirements for a cause of action under 49 U.S.C. § 42121(b), a party bringing a claim under the TFA must, "make a prima facie showing that any behavior described in paragraph (1) was a contributing factor in the unfavorable personnel action in the complaint."[94] For summary judgment purposes,

[89] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986).
[90] *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir. 1992).
[91] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505 (1986).
[92] *Id.*
[93] 26 U.S.C. § 7623(d)(1)(A). (**Emphasis** added).
[94] *Id*. Citing to 49 U.S.C. § 42121(b)(2)(B)(i).

once the plaintiff raises a genuine issue of material fact regarding their burden, the defendant-employer must "demonstrate, by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior."[95]

The "contributing factor" versus "clear and convincing evidence" standards for Biggins and NOMS respectively, set a *very high* bar upon NOMS to prevail in the case, especially at the summary judgment stage. Indeed, recently, the United States Supreme Court in *Murray v. UBS Securities, LLC*, made note of this when examining the same burden-shifting standard in the Sarbanes-Oxley Act:

> The burden-shifting framework provides a means of getting at intent, and Congress here has decided that the **plaintiff's burden on intent is simply to show that the protected activity was a "contributing factor in the unfavorable personnel action**." 49 U. S. C. § 42121(b)(2)(B)(i); see 18 U. S. C. § 1514A(b)(2)(C) (explaining that an action brought in federal court "shall be governed by the legal burdens of proof set forth in section 42121(b)"). Once the employee makes that showing, the burden shifts to the employer to "demonstrat[e], by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior." 49 U.S.C. § 42121(b)(2)(B)(ii). While many statutes dealing with employment discrimination apply a higher bar, requiring the plaintiff to show that his protected activity was a motivating or substantial factor in the adverse action, [citation omitted], **the incorporation of the contributing-factor standard in Sarbanes-Oxley reflects a judgment that " 'personnel actions against employees should quite simply not be based on protected [whistleblowing] activities' "— <u>not even a little bit</u>**. [citation omitted].[96]

### B. Biggins Has Met His Prima Facie Case At The Summary Judgment Stage.

#### *1. Biggins Engaged In Protected Activity Under The TFA.*

The parties do not dispute that Biggins made complaints during his employment about violations of tax laws, including tax fraud and tax evasion. In fact, Opfer admitted during her deposition that Biggins complained of these violations during his meeting with her and Spadaro: "[Biggins] was alleging that we were evading taxes and committing tax fraud."[97] Moreover, Biggins mentioned in numerous written communications that he believed: (1) "tax laws were not being followed"[98]; and (2) he had "concerns of Federal, State, and City tax laws being recklessly broken…"[99] Likewise, there is no dispute that NOMS was aware of these complaints.[100]

---

[95] *Id*. Citing to 49 U.S.C. § 42121(b)(2)(B)(ii).
[96] 601 U.S. 23, 37, 144 S.Ct. 445, 454-454 (2024). (**<u>Emphasis</u>** added).
[97] Opfer Depo. @ 37.
[98] Plaintiff's Depo. Ex. 12.
[99] Plaintiff's Depo. Ex 28.
[100] *See* Plaintiff Depo. Ex. 27, 30, 31, 37, 38, 39.

Furthermore, NOMS properly notes in its motion that for a whistleblower retaliation claim, an employee is not required to specifically identify the law, rule, regulation or other specific source of the violation. Indeed, the idea that Biggins was required to specifically cite to "laws" or "statutes" in his complaints, or otherwise specifically describe the alleged legal violations, has been firmly rejected by various courts—**especially when the violation concerns a topic within the scope of employment of both the complainant and the employer**. The United States District Court for the Southern District of Ohio's decision in *Rheinecker v. Forest Laboratories, Inc.* is on point.[101] In *Rheinecker*, the plaintiff worked for a pharmaceutical manufacturer. During his employment, he complained about the "mislabeling" or "adulteration" of these substances due to failed stability tests, and in doing so, faxed a written document to his supervisors regarding the failed tests. In that report, the plaintiff did not mention any specific "violation" or otherwise point to any specific statute, regulation or law that had been violated. The employer moved for summary judgment as to the plaintiff's R.C. § 4113.52 claim, but the District Court denied the motion, holding:

> Finally, the Defendants claim that the Plaintiff failed to adhere to the "written notification" requirement Whistleblower Act. The Plaintiff, however, sent a four page facsimile to his superiors in New York. The facsimile included a two page "Stability Assay Report" and a page from a lab notebook reporting the results of the failed stability test. The Defendants assert that this did not "provide[ ] sufficient detail to describe and identify ... [a] violation" as the Act requires. Ohio Rev. Code § 4113.52(A)(1)(a). **The Plaintiff on the other hand, claims that the "New York executives who received and reviewed Plaintiff's written report <u>were very familiar with stability testing and knowledgeable about the significance of the report</u>."** Plaintiff's Response to the Defendants' Motion for Summary Judgment, Doc. 49, at 7.
>
> We believe this to be a material question of fact, not appropriate for determination on a motion for summary judgment. Furthermore, if this question of fact is determined in favor of the Plaintiff, the Plaintiff would fall within the Act's protective scope. Thus, another genuine issue of material fact would exist with respect to whether the Defendants violated the Act in firing the Plaintiff, or if he was fired for a legitimate reason under the employment-at-will doctrine. The Defendants' Motion for Summary Judgment regarding the PARAL incident must, therefore, be denied.[102]

Here, unlike R.C. § 4113.52, Biggins was not required to provide *any* written report regarding his complaints, nor provide the degree of specificity regarding the various implicated laws that NOMS is looking for in its motion. Biggins was not required to know that the federal crime of tax evasion, for example, is codified

[101] 813 F.Supp. 1307 (S.D. Ohio 1993).
[102] *Id.* @ 1311-1312. (**<u>Emphasis</u>** added).

under 26 U.S.C. § 7201. Rather, Biggins intelligently communicated his complaints to NOMS, on several occasions, and there is no dispute that the subject matter of his complaints falls within the scope of protected activity under the TFA – alleging "a violation of the internal revenue laws or any provision of Federal law relating to tax fraud."[103]

*2. Biggins Had A Reasonable Belief That His Complaints Were Accurate And Correct.*

In *Rhinehimer v. U.S. Bancorp Investments, Inc.*, the Sixth Circuit Court of Appeals, in the context of a whistleblower claim under the Sarbanes-Oxley Act, held that an employee's "reasonable belief" merely requires, "a complainant 'to have a subjective belief that the complained-of conduct constitutes a violation of relevant law, and also that the belief is objectively reasonable' in light of the factual circumstances, including the 'training and experience' of the aggrieved employee."[104] This analysis is a **fact-specific** one:

> Thus, the inquiry into whether an employee had a reasonable belief is necessarily fact-dependent, varying with the circumstances of the case. For this reason, **"[t]he issue of objective reasonableness should be decided as a matter of law only when no reasonable person could have believed that the facts [known to the employee] amounted to a violation" or otherwise justified the employee's belief that illegal conduct was occurring**. *Livingston v. Wyeth, Inc*., 520 F.3d 344, 361 (4th Cir.2008) (Michael, J., dissenting) quoted in *Sylvester*, 2011 WL 2165854 at *12. If, on the other hand, "reasonable minds could disagree about whether the employee's belief was objectively reasonable, **the issue cannot be decided as a matter of law**." *Id*. In accordance with our discussion above, an employee need not establish the reasonableness of his or her belief as to each element of the violation. Instead, the reasonableness of the employee's belief **will depend on the totality of the circumstances known (or reasonably albeit mistakenly perceived) by the employee at the time of the complaint**, analyzed in light of the employee's training and experience. See *id.; Wiest*, 710 F.3d at 135 (applying the *Sylvester* reasonable belief standard).[105]

In the present matter, there is no argument from NOMS that Biggins lacked or did not otherwise have a *subjective* belief that NOMS committed one or more violations related to tax fraud or evasion, and NOMS does not otherwise address the "subjective" component in their motion.

As to the "objective" reasonableness of Biggins' complaints, there are several disputed facts that prevent summary judgment. First, start with Biggins' experience. Normally, to defeat an objective

---

[103] 26 U.S.C. § 7623(d)(1)(A).
[104] 787 F.3d 797, 808 (6th Cir. 2015) citing and quoting *Sylvester v. Parexel Int'll LLC*, 2011 WL 2165854, *12 (ARB 2011).
[105] *Id.* @ 811-812. (**Emphasis** added).

reasonableness argument, the employer will try to attack the whistleblower's "lack of" experience, training or knowledge in the particular area at issue; however, here NOMS cannot do that for the simple reason that Biggins may, perhaps, be the most qualified, knowledgeable and trained person regarding these tax issues…in the entire case.[106] He has 20 years of experience as a licensed CPA and the same amount of life experience working as a CPA, auditor, federal tax agent, controller and accountant for various entities. Moreover, it was literally Biggins' job at NOMS to draft, amend, and review the very physician financial statements that were at issue regarding the zero-out incident of 2021 income that was then credited to 2022 K-1s. Biggins reviewed these documents and very simply identified the problem, which he then immediately reported to Spadaro.

Moreover, unlike Biggins, Spadaro and Opfer have little-to-no tax experience, neither are CPAs, and neither of them could opine as to the reasonableness of Biggins' complaints. That left Brent Thompson at Meaden as the only other body who reviewed any of Biggins' complaints. In their motion, NOMS basically argues that because Thompson came to his own conclusion that Biggins was "wrong" and NOMS was "right," that means Biggins' complaints were not reasonable. However, it simply is not relevant whether Thompson agreed with NOMS on the end-conclusion, for the simple reason that even if Biggins was "wrong," that does not impact the reasonableness of his complaints at the time he made them.

Next, in their motion, NOMS states that Biggins "did not know what records Meaden & Moore was provided…" and otherwise insists that there was information reviewed or shared with Meaden that Biggins was not privy to. If this is true… it hurts NOMS' position because again, the reasonableness standard "will depend on the totality of the circumstances **known** (or reasonably albeit mistakenly perceived) by the employee **at the time of the complaint**."[107] Here, it does not help NOMS to point out that Biggins, (1) was never allowed to communicate with Thompson or Meaden directly, (2) all information shared between him and Meaden went through Spadaro and Opfer (who lacked the knowledge to understand these complex tax issues); and (3) if Meaden did have other documents or information that influenced their conclusions, admitting that Biggins was

[106] See Plaintiff Depo. Ex. 54 (Zwick Report). Even Zwick notes Biggins' extensive experience on these tax-related issues.
[107] *Rhinehimer* @ 811-812. (**Emphasis** added).

not aware of those documents or information only makes his complaints that much more reasonable based on what "he knew at the time."[108]

Next, NOMS contends that Biggins was required get a "second opinion" about his complaints. There is no such requirement under the law, and NOMS does not point to one. Moreover, to say that Biggins did not conduct an adequate investigation into his own complaints is misplaced because the record is littered with communications where Biggins requested meetings with: (1) the Board at NOMS, (2) the compliance committee, and (3) eventually Meaden – all for the purpose of looking into these issues. Furthermore, Biggins himself, as a licensed CPA, investigated these same matters, starting with his review of the December 2021 entry from Spadaro that did not match Biggins' financial statements for the physicians for the 2021 year.[109] There simply is no evidence that Biggins just haphazardly made these complaints or did so without the knowledge and training necessary to form an intelligent position.

Finally, NOMS' attempt to use Gary Zwick to opine on Biggins' "reasonable belief" is likewise misplaced. For one, Zwick cannot form an expert legal conclusion regarding a fact-specific, totality of the circumstances test for the "reasonableness" of Biggins' complaints. To this end, Zwick admitted, that despite his experience in area of tax law, he has never once, prior to this case, offered an expert opinion as to the reasonableness of an employee's report of tax violations.[110] Moreover, Zwick himself noted Biggins' extensive experience as a CPA and admitted in his own report that Biggins was qualified to discuss and report on tax issues at NOMS.[111] Despite this, Zwick, as a hired expert for the defendant, essentially opines that because Biggins was so qualified and knowledgeable of these issues, he "ought to know better" that his complaints were incorrect.[112] That's it – that's the totality of any opinion from Zwick about Biggins' reasonable belief. Indeed, Zwick admitted to having no knowledge of what information Biggins had (or did not have) available to him at

[108] Exhibit 1: Biggins Declaration @ ¶ 14, 15, 17.
[109] Exhibit 1: Biggins Declaration @ ¶ 7, 8, 9.
[110] Zwick Depo. @ 59-60. (Excerpts filed as Exhibit 7).
[111] Plaintiff Depo. Ex. 54 (Zwick Report @ 5).
[112] Zwick Depo. @ 59.

the time he made his complaints.[113] Thus, this is not an "expert" opinion on this fact issue, and even if it was, Biggins' own evidence, as well as his own knowledge and expertise, at the very least, raises a dispute with Zwick's opinion for purposes of summary judgment.

*3. Even Though Not Required, The Evidence In The Record Supports The Conclusion That Biggins' Complaints Were Not Simply Reasonable, They Were Correct.*

Zwick's report not only falls short on the "reasonable belief" element, but it also reveals a flaw in NOMS' overall position that Biggins's complaints were not accurate.[114] Indeed, Zwick's report contradicts the testimony of NOMS' own witnesses regarding "why" NOMS moved the 2021 income over to 2022 and paid it through a K-1 for each physician rather than on their 2021 W2. Specifically, up to the time of Zwick's report, Spadaro and even Thompson (Meaden) had both taken the position that this action was done out of necessity because of a "timing" issue – meaning the income was not fully known by December 31, 2021, so it *had* to be paid in 2022.[115] Not only did Spadaro admit this during his deposition, but Thompson himself, in response to Biggins' complaints, said this incident was "a timing difference."[116]

However, Zwick takes a different approach in his report, and in doing so, undermines NOMS' position entirely. First, he rejects that 2021-2022 event was a "timing" issue.[117] Instead, Zwick opines that the reason these physicians were paid 2021 income in 2022 is because it was part of a bonus system NOMS uses for its physicians.[118] Zwick based this opinion on two specific documents given to him by NOMS: (1) sample financial statements, and (2) a sample Member Engagement Agreement.[119] As to the former, Zwick was given a simplified version of a physician financial statement that *only* showed a YTD amount in the Ending Holdback Account (a single number) – versus a 12-month financial statement showing how that amount accumulated

---

[113] Zwick Depo. @ 66-67.
[114] By citing to and discussing Zwick's report herein, Biggins does not waive any objection, including any *Daubert* challenge, related to Zwick's testimony and/or suitability as an "expert" in this case. Biggins will address such issues prior to trial.
[115] Spadaro Depo. @ 62-63.
[116] Plaintiff's Depo. Ex. 27 @ p. 1 and 3.
[117] Plaintiff's Depo. Ex. 54 (Zwick Report @ 4).
[118] *Id.*
[119] Plaintiff's Depo. Ex. 55.

over the year.[120] Zwick admitted that because the financial statement given to him only showed the end-YTD figure, he was not able to determine how that figure was generated over the prior 12-months and/or what that figure would look like in any of the prior 11 months of the year.[121] This is critical, because in the Member Engagement Agreement, it provides the following:

> Bonus. After the end of each month, NOMS will prepare a financial statement for the previous month. This financial statement will identify the Net Income of Physician and such Net Income, whether negative or positive, will be reflected in the Hold Back Account of Physician. **If the Hold Back Account contains a Surplus, Physician may request that NOMS pay Physician an amount up to the difference of the Surplus minus the Minimum Hold Back Requirement**. **Physician may request payment of this amount on a quarterly basis**. If the Hold Back Account contains a negative amount, the Board will reduce the Base Draw for all subsequent periods in an amount reasonably expected to produce a Surplus in the Hold Back Account. Physician may not operate with a negative balance in the Hold Back Account.[122]

Here, NOMS' own agreements with their physicians specify that when the physician gets their updated monthly financial statement, it is **up to them** whether to draw compensation out of their Ending Holdback Account ("EHA") (assuming there is a surplus above the minimum holdback requirement).[123] Quite simply, in layman's terms, each month, the physician gets to decide whether to take out compensation from the account (as wages, distributions, etc.) or simply leave it in the account (i.e. like a bank account).[124] Either way, the compensation belongs to them and was earned by them *that same year*, regardless of whether they choose to withdraw it.[125] In his report, and subsequent deposition, Zwick admitted that he was not provided with this information, and seemed to be under the belief that the EHA amount was simply from December, not an accumulated amount over the course of the year.[126]

This is also in line with Frederick's testimony on the same issue (another licensed CPA). During his deposition, Frederick admitted that over the course of the year (or in this case, quarterly pursuant the Member

[120] Plaintiff's Depo. Ex. 55 (financial statements); Zwick Depo. @ 25-26, 39. Compare to Exhibit 1-A, financial statement for Dr. Fahim showing 12-month summary of income.
[121] Zwick Depo. @ 39.
[122] Plaintiff's Depo. Ex. 55 (Member Engagement Agreement). (**Emphasis** added).
[123] *Id.*; Exhibit 1: Biggins Declaration @ ¶ 8, 20, 21.
[124] Exhibit 1: Biggins Declaration @ ¶ 8, 20, 21.
[125] *Id.*
[126] Zwick did not know the minimum holdback amount figure, nor did NOMS provide it to him prior to his report. *See* Zwick Depo. @ 38; Compare to Exhibit 1-A.

agreement), the physician "would be able to draw on that credit."[127] Specifically, as it related to Dr. Fahim and the other physicians, Frederick admitted, "that is [the physician's] capital account and funds available to him that **he did not take as wages in the '21 year**, correct."[128] Frederick explained further that this amount remained in the physician's EHA because "he did not take W-2 wages, he did not zero out his capital account or take W-2 wages in '21."[129] In both instances, Frederick confirmed it was the "physician's choice," to take or leave this money, not NOMS'.

These admissions, coupled with Zwick's analysis, are critical, because they lend credibility that Biggins' complaints were correct – that the physicians had constructive receipt over this income, and therefore, as a matter of law, the income was *earned* by the physician and should have been taxed that same year.[130] Indeed, NOMS' own Member Engagement Agreement dictates that the physicians were eligible to take compensation from the EHA on a quarterly basis – whether they chose to do so or not was irrelevant, they had constructive receipt of that compensation. Thus, because those physicians were W2 employees during 2021, that income, even if left in the EHA, should have been taxed via their 2021 W2s. This is precisely what Biggins noticed and then reasonably complained about to Spadaro and NOMS, up to his termination.

### C. There Is Fact Dispute That Biggins' Complaints Were A Contributing Factor To His Termination.

To satisfy the final element of his prima facie case, Biggins merely needs to raise a question of fact that his complaints were a "contributing" factor to the adverse actions taken against him, including his termination. As held by the U.S. Supreme Court in *Murray*:

> **The ordinary meanings of the words "contribute" and "factor" suggest that the phrase "contributing factor" is broad indeed**. See Webster's New World College Dictionary 317 (4th ed. 1999) (defining "contribute," in the relevant sense, to mean "to have a share in bringing about (a result); be partly responsible for"); id., at 508 (defining "factor" as "any of the circumstances, conditions, etc. that bring about a result"). Showing that an employer acted with retaliatory

[127] Frederick Depo. @ 31.
[128] *Id*. (**Emphasis** added).
[129] *Id*. @ 34-35.
[130] Exhibit 1: Biggins Declaration @ ¶ 22; *See* 26 CFR § 1.451-2 (Constructive receipt doctrine). (Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given.)

> animus is one way of proving that the protected activity was a contributing factor in the adverse employment action, but it is not the only way.[131]

The Sixth Circuit has defined "contributing factor" as "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision."[132] Moreover, "the contributing factor standard is forgiving" and "**for employers, this is a tough standard**, and not by accident."[133] Importantly, a contributing factor need not be the sole factor causing the adverse action. Circumstantial evidence of a contributing factor can include: "temporal proximity, indications of pretext, inconsistent application of an employee's policies, shifting explanations for an employer's actions, antagonism or hostility toward a complainant's protected activity, falsity of an employer's explanation for the adverse action taken, and change in the employer's attitude toward the complainant after he engages in protected activity."[134] Here, several of these examples are present.

First, there is notable temporal proximity between Biggins' complaints, including his retaliation complaint, and his termination. Indeed, while Biggins initially raised his first complaint in January 2022, because nothing was addressed at that time, Biggins later revived his complaints, first in July 2022 following his annual review where he put his complaint in writing for the first time in the comments section of his review. Within three months of this, Biggins was disciplined for the first time ever during his employment. Thereafter, Biggins again reemphasized his complaints directly to Spadaro, Opfer and Ryan Williams on November 29, 2022. Within two months of this, NOMS terminated his employment. Finally, on January 23, 2023, **just three days before his termination**, Biggins expressed to Opfer that he felt he was being retaliated against by Spadaro, based on those same tax fraud concerns he had documented, initially in his performance review. This temporal proximity weighs in Biggins' favor, especially when considering that he had been employed with

---

131 *Murray*, supra, @ 37. (**Emphasis** added).
132 *Consolidated Rail Corp. v. U.S. Dept. of Labor*, 567 Fed.Appx. 334 (6th Cir. 2024).
133 *Id. @* 338; *Ma v. American Elec. Power Inc.*, 123 F.Supp.3d 955 (W.D. Mich. 2015). *Indiana Mich. Power Co. v. U.S. Dep't of Labor*, 278 Fed.Appx. 597, 603 (6th Cir. 2008) (quoting *Stone & Webster Eng. Corp. v. Herman*, 115 F.3d 1568, 1572 (11th Cir. 1997)). (**Emphasis** added).
134 *Lemon v. Norfolk So. Ry. Co*., 958 F.3d 417, 419 (6th Cir. 2020); *Hand v. CSX Transportation, Inc.*, 2021 WL 963584 (S.D. Ohio).

NOMS since 2017 had not had so much as one negative comment in any review, nor any discipline until after he first raised his tax fraud (and retaliation) complaints.

Second, NOMS inconsistently applied its own progressive disciplinary policies towards Biggins. Initially, his November 2022 write up skipped the first disciplinary step and Opfer admittedly corrected it – after Biggins complained about the skipped step. Following this, despite NOMS' own policy setting forth progressive disciplinary steps in the following order: Record of Conversation, Formal Reminder, Final Warning, Termination[135] – NOMS skipped the second and third steps of that process and terminated Biggins in late January 2023, following his initial Record of Conversation. At trial, NOMS is free to explain to the jury "why" they skipped those steps, but for purposes of summary judgment, there is at least a question of fact weighing in Biggins' favor based on NOMS skipping those steps in contradiction to their own policy.

Third, there is some evidence of "shifting explanations" for Biggins' termination. Indeed, according to NOMS, they were planning to terminate Biggins in late November 2022 for "insubordination" after he made several requests to meet with the Board about his tax complaints. After that moment passed, less than two months later, now NOMS was back to accusing Biggins of "leadership" and "communication" issues with his fellow employees, again, an issue that had never been raised once with Biggins in six years of employment, including as late as July 2022 during his last annual performance review. If NOMS still felt Biggins had these issues, why attempt to terminate him for "insubordination" in late November instead, and then revert back to these allegations less than two months later? This is a jury question.

Fourth, there is evidence of "antagonism or hostility toward [Biggins'] protected activity." Here, after Biggins restated his complaints on November 29, 2022, and asked for meetings with the Board and compliance committee, Frederick expressed displeasure with Biggins' reports and went as far as stating that he wanted to be present for meetings to "poke holes" in Biggins' position and stated that Biggins' statements "bothered" him.[136] Later, less than a month before Biggins' termination, Frederick (who is the CEO of the company), sent

---

[135] *See* Plaintiff Depo. Ex. 2.
[136] Plaintiff Depo. Ex. 24.

another email expressing that Biggins should "not question" the company's tax methodologies and that Frederick "will have a short leash" for Biggins moving forward because he was a "disruption."[137] These are clear statements showing "antagonism or hostility" towards Biggins concerning his tax fraud complaints.

Fifth, similar to the temporal proximity evidence, there was a "change in the employer's attitude toward [Biggins] after he engaged in protected activity." Indeed, NOMS cannot explain how Biggins was seemingly a well-performing employee between 2017 and 2022 with nothing but positive reviews, yet, he then suddenly had this laundry list of "lack of leadership and communication" concerns with *numerous* other employees. Indeed, even in the November 2022 Record of Conversation, NOMS says these alleged problems had been issues for Biggins "since the pandemic,"[138] which would mean 2020-2021, not late 2022. If this statement is true, where is the evidence supporting those allegations from 2020? 2021? There is none, because there were no such issues. These allegations were manifested **after** Biggins raised his tax fraud complaints.

Finally, NOMS' reliance on Harrington stating that she was "independently aware" of concerns about Biggins is not dispositive for purposes of summary judgment. As Biggins will address in the next section, Harrington's statements are based on nothing beyond inadmissible hearsay, no actual Rule 56 evidence. At her deposition she was unable to identify any specific conversations with any employees, had no notes of any such conversations, no details of any such allegations, nothing[139]… not until she created her own written statements for these employees on the very morning Biggins was fired. If NOMS wants to present her testimony at trial to try to convince a jury that she is credible, Biggins welcomes it; however, her self-serving testimony that she "independently" reviewed or investigated this matter does not hold up when looking at the evidentiary record.

### D. NOMS Cannot Meet The High Burden Of Showing By Clear And Convincing Evidence That It Would Have Terminated Biggins Absent His Complaints.

In their own motion, NOMS admits that in order to gain summary judgment during the final stage of Biggins' TFA claim, they must present "**overwhelming and uncontroverted**" evidence that they would have

[137] Plaintiff Depo. Ex. 35.
[138] *See* Plaintiff Depo. Ex. 16.
[139] Harrington Depo. @ 32, 78-79, 81-82.

terminated Biggins absent his complaints. As explained by the Sixth Circuit in *Disner v. Westinghouse Elec. Corp*., "when clear and convincing evidence is required, juries should be instructed that they must be persuaded that the truth of the contention is highly probable, as opposed to more likely than not."[140] Stated another way, including by Judge Helmick in *United States v. Barnwell*, "clear and convincing evidence is evidence sufficient to 'place in the ultimate factfinder an abiding conviction that the truth of its factual contentions [is] highly probable.'"[141] Notably, the ultimate "factfinder" in this case is the jury, not the Court.

Here, NOMS rests its entire position on the attempt to isolate Harrington as a supposed independent actor who was unstained by the knowledge of Biggins' tax fraud complaints. However, this argument is not dispositive for summary judgment for two reasons: (1) the evidence does not support Harrington acting independently despite her self-serving testimony otherwise, and (2) the alleged investigation itself was a sham and based solely on hearsay, as gleaned from the documents themselves.

First, Harrington's statement that she conducted her own investigation and made the decision to terminate Biggins is at odds with the timeline in Feldman's January 26, 2023 email. Therein, Feldman very specifically states that, "**On Thursday, January 26, 2023, Sarah Opfer, CHRO, approached Erika Harrington, HR Director and me, HR Manager** asking if we could review the documentation regarding Shawn Biggins. Sarah asked us to determine the next corrective action steps for Shawn and recused herself."[142] Feldman's email reveals a few things: one, it contradicts any testimony from Harrington that she was involved in any sort of investigation *prior* to January 26, 2023, the very same morning Biggins was terminated. While Harrington is free to state otherwise at trial, her testimony, at the summary judgment stage, does not dismiss Feldman's email which suggests that she and Harrington were not even notified of this matter until January 26, 2023. If the jury finds Feldman's email credible, it potentially would erase any notion that Harrington conducted her own "independent" investigation that led to Biggins' termination. Moreover, there are no other documents

---

[140] 726 F.2d 1106 (6th Cir. 1984).
[141] 2021 WL 1964261 (N.D. Ohio); *United States v. Beard*, 528 F.Supp.3d 764 (N.D. Ohio 2021).
[142] Plaintiff's Depo. Ex. 47. (**Emphasis** added).

suggesting Feldman's statements are untrue; indeed, all of the hearsay statements that Harrington wrote for Biggins' coworkers were drafted and sent that same morning, on January 26.

This timing is important because if it was Opfer who in fact collected this "documentation" referenced in Feldman's email and she was merely passing it to Harrington, then NOMS cannot argue that this was Harrington's "independent" investigation, rather, she used information Opfer provided. Opfer, of course, knew of Biggins' tax fraud complaints (as well as his retaliation complaint from a few days prior) and was intimately involved in those complaints, being person who was passing information between Biggins and Thompson (Meaden) regarding the same. Thus, at the very least, there is evidence of a cat's paw scenario regarding information that was gathered by Opfer and then given to Harrington to carry out Biggins' termination.[143]

Separately, Feldman's email highlights that "next corrective action" was being considered, which implicates the earlier November 2022 Record of Conversation. It is undisputed that Opfer, along with Spadaro, issued that initial progressive disciplinary action, which is contemplated in Feldman's email. Thus, there are several factual issues for the jury to determine: did this initial corrective action contribute to Biggins' termination, and if so, why did Harrington or NOMS skip further steps in that process and advance Biggins to termination? Indeed, Harrington testified that when Biggins was terminated, she did not have any knowledge of what step of progressive discipline Biggins was on, how he got there, or whether there were other steps prior to termination.[144] She admitted all this despite being familiar with NOMS' progressive disciplinary policy.[145]

Next, upon review of record, even if Harrington did conduct an investigation, it was insufficient, if not completely manufactured as a pretext. As an initial matter, NOMS' defense is premised upon these "email statements" that Harrington drafted on January 26, 2023 and sent out to various employees.[146] None of these emails have been authenticated or sworn to by the employees in question. For that reason alone, the Court

[143] See *Bishop v. Ohio Dept. of Rehab. & Corr.,* 529 Fed.Appx. 685 (6th Cir. 2013) (An employer may be held liable under a cat's paw theory of liability "[w]hen an adverse decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias.").
[144] Harrington Depo. @ 69-70.
[145] *Id*. @ 16-17.
[146] *See* Deft. MSJ @ Ex. A, B, C, and D.

should not consider these email statements as Rule 56 evidence.[147] Indeed, while Harrington can testify that she wrote these emails, NOMS is attempting to use the substance of the emails to assert the alleged truth that Biggins engaged in the described conduct or otherwise had behavior/communication issues. However, NOMS has not submitted any affidavits or declarations from any of these employees in question, and thus cannot use second-hand typed statements to attempt to create testimony from these employees that does not otherwise exist. Instead, the Court should disregard these email statements as hearsay.

Moreover, assuming *arguendo* that the email statements are admissible at this stage, they only show that Harrington and NOMS essentially papered Biggins' file as quickly as possible before terminating his employment. As discussed in the Facts section, from the time Harrington emailed the first statement to the first employee to when NOMS reported the decision to terminate, a grand total of **54 minutes** elapsed (from 10:20 am to 11:14 am). Surely, a reasonable jury could determine that 54 minutes is not a suitable amount of time to conduct an "investigation" into any alleged performance issues by Biggins. Moreover, several of those same employees responded to Harrington's emails with comments, edits or even disagreement with her drafted statements, yet, she never corrected those statements, resent them to the employees or asked for further information. Instead, she sent all of them to Spadaro (who had knowledge of Biggins' tax fraud complaints and was the subject of Biggins' retaliation complaint), and then Biggins was fired. All within the same hour. This "evidence" falls vastly short of being "overwhelming and uncontroverted" to rise to the required level of clear and convincing. Thus, the Court should deny summary judgment.

## IV. CONCLUSION

Based on all of the foregoing reasons, Biggins respectfully requests that this Court deny Defendant's Motion for Summary Judgment in its entirety.

---

[147] See *Bluegrass Dutch Tr. Morehead, LLC v. Rowan Cnty. Fiscal Ct*., 734 Fed.Appx. 322, 327 (6th Cir. 2018) (quoting *Daily Press, Inc. v. United Press Int'l*, 412 F.2d 126, 133 (6th Cir. 1969)) ("Hearsay evidence generally cannot be considered on a motion for summary judgment."). See *Turnbow-Avery v. Tuling*, 2025 WL 2051758 (S.D. Ohio) (Court excluded statements as inadmissible hearsay for purposes of summary judgment because the statements were "not sworn to or submitted under penalty of perjury").

Respectfully submitted,

*/s/ Fred M. Bean*

Fred M. Bean (0086756)
**SPITZ, THE EMPLOYEE'S LAW FIRM**
3 Summit Park Drive, Suite 200
Independence, OH 44131
Phone: (216) 291-4744
Fax: (216) 291-5744
Email: Fred.Bean@SpitzLawFirm.com

*Attorney for Plaintiff Shawn Biggins*

**CERTIFICATE OF COMPLIANCE WITH L.R. 7.1(f) AND REQUEST FOR ORAL ARGUMENT UNDER L.R. 7.2(b)**

I hereby certify that the instant matter is assigned to standard track and that the foregoing complies with Local Rule 7.1(f), as modified by Court Order. Moreover, due to the complexity of the facts and issues, **Plaintiff hereby requests, subject to the Court's discretion under L.R. 7.2(b), that this matter be set for Oral Argument once briefing is complete**. Plaintiff submits that an oral argument would allow the parties to provide further detail as to the main issues before the Court.

*/s/ Fred M. Bean*
Fred M. Bean (0086756)

**CERTIFICATE OF SERVICE**

I certify that the foregoing was served via the Court's Online Filing System this 9th day of January 2026, upon all parties.

*/s/ Fred M. Bean*
Fred M. Bean (0086756)