**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**SHAWN BIGGINS,**

Plaintiff,

v.

**NORTHERN OHIO MEDICAL SPECIALISTS, LLC,**

Defendant.

CASE NO. 3:23 CV 1917

JUDGE JAMES R. KNEPP II

**MEMORANDUM OPINION AND ORDER**

## INTRODUCTION

Currently pending before the Court in this Taxpayer First Act whistleblower employment discrimination case are Defendant Northern Ohio Medical Specialists, LLC's Motion for Summary Judgment (Doc. 29) and its related Motion to Strike Plaintiff's Untimely Expert Report and Exclude Lay Statements (Doc. 32). Both are fully briefed and ripe for decision. *See* Docs. 31, 33, 34, 35. Jurisdiction is proper under 28 U.S.C. § 1331. For the reasons set forth below, the Court denies both motions.

## BACKGROUND

Plaintiff, a licensed Certified Public Accountant ("CPA") since 2006, began working for Defendant in 2017 as a staff accountant. (Plaintiff Depo., Doc. 25-1, at 11, 49). Prior to this, Plaintiff worked as an Auditor and Senior Tax CPA with an accounting firm from 2007 to 2011, followed by a CPA and Accountant position with Firelands Physicians Group from 2012 to 2015. *Id.* at 14.

Plaintiff was promoted to Controller with Defendant in 2018, and in 2022, reported to the Chief Financial Officer ("CFO"), Giovanni Spadaro. *Id.* at 56-58. One of Plaintiff's duties as

Controller was "manag[ing] and comply[ing] with local, state, and federal government reporting requirements and tax filings." (Doc. 31-8, at 11) (job description). In 2022, three employees reported to Plaintiff. *See* Plaintiff Depo., Doc. 25-1, at 59.

Defendant is a physician-owned multi-specialty group based out of Sandusky, Ohio. (Plaintiff Decl., Doc. 31-1, at 2). Physicians typically started out as W-2 employees (meaning the physician works as an employee of the company) but, after some time, physicians may become partners in the business. *Id.* Among other things, this results in the physician being required to file a K-1 tax report for business partners rather than a W-2 for employees. *Id.*; *see also* Zwick Report, Doc. 21-1, at 2.

<u>January 2022 Complaint</u>

One of Plaintiff's duties was to oversee the production of periodic financial reports, including monthly financial statements. (Plaintiff Decl., Doc. 31-1, at 1). In January 2022, Plaintiff discovered a change in the company's financial statements and brought it to the attention of the CFO (Spadaro). (Plaintiff Depo., Doc. 25-1, at 61-65). Specifically, Plaintiff testified he completed the 2021 financial statements on January 14, 2022, and then on January 17, Spadaro told him to "rerun" the statements. *Id.* at 61. After doing so, Plaintiff believed $150,000 in profits had been removed from a special medical group's statement; he further believed this had happened for every new "owner" of the company. *Id.* at 64-65. He states this was due to Spadaro making a new entry in the internal accounting system. (Plaintiff Decl., Doc. 31-1, at 2). After Plaintiff raised the issue, he recalls Spadaro telling him, "we were not changing anything and that the new owners . . . their profits were being put in the next year, if I can remember everything correctly." (Plaintiff Depo., Doc. 25-1, at 66); *see also* Plaintiff Decl., Doc. 31-1, at 2 ("[T]his entry noted that NOMS was erasing $728,138.52 of income from 2021 and

'crediting' that income for 2022 instead."); (Doc. 31-8, at 33) (entries). Spadaro testified he told Plaintiff: "This is the entry. This is correct to ensure their basis carries over and then, for tax purposes, to make sure they pay taxes on it as a K-1 owner." (Spadaro Depo., Doc. 27-1, at 68). At some point, he also told Plaintiff this method was approved and recommended by an outside CPA firm, Meaden & Moore, following Plaintiff's original complaint. *See id.* ("At some point I did, but I don't remember exactly when."); *see also* Doc. 5, at 6 (Amended Complaint) ("Spadaro told [Plaintiff] that he did not believe that his deleting profit from the 2021 tax year was a concern and that it was what he was advised to do by 'accountants.'").

Plaintiff asserts this reassignment of income is a violation of "tax law." (Plaintiff Depo., Doc. 25-1, at 176). There is no dispute Plaintiff subjectively believed this to be an incorrect or fraudulent practice. Essentially, he contends the income was earned in 2021 when the physicians were W-2 employees and thus should have been taxed as such, but this change made it so that earned income was taxed as 2022 income when the physicians were K-1 owners/partners. *See* Plaintiff Decl., Doc. 31-1, at 2. The tax consequences are different for K-1 income and W-2 income. *See id.* at 2. Plaintiff testified:

> Q: The partners of NOMS pay the taxes for the new physicians that are being elevated to partner the following calendar year, correct?
>
> A: They are doing that, but they are doing that incorrectly because those amounts should be on the W-2.
>
> Q: That's my question.
>
> A: That's the tax law.
>
> Q: That's my question. The federal government is being paid those taxes by the other physician partners, correct?
>
> A: Not correct, no, because like I said, if you're going to carry those into another year, right, there's a whole new set of assumptions and situations

> going on where those taxes, who knows what will happen to them. You never know. What if the company has a huge loss?

(Plaintiff Depo., Doc. 25-1, at 176). By contrast, Defendant's expert, Gary A. Zwick, explains:

> After December 31, 2021, individual physician profit and loss statements were adjusted for the income that was distributed to the physician in 2022 as determined in January 2022 to reflect that this income was actually paid in 2022 although it reflects profit made in 2021. Since the federal tax cutoff is on December 31, the income earned in the last month of 2021 is shown on the company tax return and allocated to physicians who were partners in 2021. Then when paid in 2022, the income paid to the physician who earned it is allocated to that physician so he pays tax on it when he receives it.

(Zwick Report, Doc. 21-2, at 2). Zwick opines Defendant's practice was proper in this regard. *Id.* at 3-4. He further opines Plaintiff's complaints "were both subjectively and objectively unreasonable." *Id.* at 5.

Again, after Plaintiff raised the issue, Spadaro told him it had been done correctly and outside accountants approved the practice. (Spadaro Depo., Doc. 27-1, at 68); *see also* Doc. 5, at 6 (Amended Complaint's statement that "Spadaro told [Plaintiff] that he did not believe that his deleting profit from the 2021 tax year was a concern and that it was what he was advised to do by 'accountants.'"); *see also* Spadaro Depo., Doc. 27-1, at 68 (stating that "[at] some point" Spadaro communicated to Plaintiff that he had talked to the outside CPA firm about Plaintiff's concerns, but he did not "remember exactly when").

In response to Defendant's Motion, Plaintiff submitted a Declaration. (Doc. 31-1). Therein, he explains the basis for his concerns and his disagreement with Zwick's opinions, based on his experience.[1]

---

1. Defendant moves to strike Plaintiff's Declaration, in part arguing it is an untimely unnoticed expert report. (Doc. 32, at 1). It is undisputed Plaintiff was not designated as an expert witness in this case, but the Court finds any such failure to disclose harmless in the context of this case. *See* Fed. R. Civ. P. 37. Defendant cannot be surprised, given Plaintiff worked for it as Controller, and

June 2022 Performance Review

In summer 2022, Defendant conducted Plaintiff's annual performance review. (Doc. 31-8, at 36-47). Spadaro rated Plaintiff's performance as meeting or exceeding expectations in most categories and the review was generally positive. *See id.* In the "overall comments" section at the end of the review which provided space for both Spadaro and Plaintiff to provide "any other feedback you wish to provide," Plaintiff wrote:

> I have concerns on some things as far as Tax Laws not being followed according to my recommendations as well as some accounting practices that need changed. These items need changed going forward for sure. I will continue to communicate what we should do however it remains to be seen if these things are truly followed or not.

*Id.* at 46.

Spadaro was aware of this comment and that it related to the handling of the 2021 to 2022 W2 to K1 shift. (Spadaro Depo., Doc. 27-1, at 77-78).

On July 13, 2022, Plaintiff received a 36% raise ($29,000). (Plaintiff Depo., Doc. 25-1, at 75). The following day, Plaintiff sent an email to Spadaro entitled "My Performance Review from Yesterday," thanking him for the review, and noting "2 major concerns" were not covered:

> 1) I did NOT discuss the primary Tax Issue that happened in 2021 and in 2022 within NOMS and is a major concern. The best solution is to put me in charge of all this somehow since I am the only one who will catch and stop these kinds of scenarios before they happen. My public accounting experience and active CPA license are the difference makers for next time. This is another example of how things get missed without me being involved in high-level meetings. My expertise is missing in high places at NOMS which is obvious to me.
>
> 2) Also, my management level as "Supervisor" on the CompAnalyst Report doesn't seem right. After reading through the hand-out you gave me in more detail on my compensation after our meeting, I determined that my job duties on the Comp[A]nalyst Report do not line-up with my current job duties and

given the subject matter of this case – Plaintiff's interpretation of Defendant's tax compliance – that Plaintiff would explain his reasoning and understanding in this regard.

> my many accomplishments at NOMS as 'Controller'. In fact, it doesn't even seem close after further examination and reflection. It was difficult to read through this info. During the review. What options do we have on this? How am I not at least at the 'Director' level? How can we possibly be misunderstanding one another this much?

(Doc. 25-1, at 276). Spadaro responded to each point:

> 1. What is the primary tax issue you are referring to? Once I have a better understanding of this I will know how to move forward. I understand that you are a CPA and have public accounting experience. Thank you for noting that.
>
> 2. I'm sorry you feel this way about your review and the CompAnalyst report presented. As we discussed yesterday, you currently oversee half of an accounting department (less payroll and less all subsidiaries of NOMS). There are many variations of what a controller can be responsible for, and I feel the CompAnalyst report I presented is more than fair. Obviously, it will not include every single job duty that you perform as it is intended as [a] guideline for a specific position. I have Directors that oversee many systems, take on projects and [are] responsible for 15-30+ staff members, including manager and assistant managers. Among other things, they are responsible for various committee meetings as well. If you look at ranges within NOMS as a company, your new compensation is VERY fair given your job duties and flexibility. If you remember when we changed your title, there was no real thought put into it (my fault) and I allowed you to choose your title from staff accountant to controller.
>
> To be honest, I was taken back yesterday with your response to a $29,000/36% raise and getting you into six figure compensation. You smiling, smirking and laughing while looking at the data was very unprofessional and arrogant. I even asked you what was so funny. This will not be tolerated under my management. The same will go when talking to and emailing other team members.
>
> You have all the flexibility to perform your job when you see fit. I do not want to put you on a set schedule and you are able to do what you want when you want. I have never denied your PTO or even questioned it.
>
> Again, I am sorry you feel this way. I was very excited yesterday to present you with a good review and increased compensation. It's unfortunate that you do not feel the same.
>
> I would be more than happy to set up another in person meeting to discuss this further, but at this time, the report and $109K base salary will stand.

*Id.* at 275.

Spadaro then forwarded the email to Sarah Opfer, Defendant's HR Manager, commenting "FYI." *Id.*

Further 2022 Events

At some point in 2022, an employee who reported to Plaintiff ("Jacqui") "made some references in her exit interview about the way [Plaintiff] had treated her." (Opfer Depo., Doc. 26-1, at 49-50). As to the departing employee, Plaintiff allegedly "made a derogatory comment in an email to her referencing her as Superwoman and she took offense to it." *Id.* at 51. Opfer noted she and others had "heard some complaints through the hallway within that team about how they were treated, how he was treating his team members on Teams calls and some complaints with vendors." *Id.* at 50. Spadaro also observed "at some point [in 2022] [Plaintiff's] behavior became pretty erratic." (Spadaro Depo., Doc. 27-1, at 95-97).

On October 17, 2022, Spadaro forwarded an email to Plaintiff and others regarding implementation of a new IT file sharing system and asking for any objections. (Doc. 25-1, at 278-79). Plaintiff responded, objecting in part and stating: "You just do not deal with this like I have to and have ignored my previous requests." *Id.* at 278. Spadaro responded: "I did not ignore your request but simply followed the lead from our Chief Information Officer. Let's work as a team Shawn and figure out the best solution as a team." *Id.* To this email, Plaintiff responded: "I am working as a Team. Pls acknowledge my concerns (as Team Leader that is your job) as I have many that go unacknowledged just like this did many times over too. I know you get a lot of emails just like me and it may be hard to respond but that is surely how it comes across. No big deal. I train my team to be honest and that is by far one of the absolute best policies that exists. Enjoy the day my friend!" *Id.* at 277. Spadaro forwarded this email to Opfer, citing concerns with Plaintiff's interpersonal communication skills, time management, and taking

direction from his manager. *Id.* He told Opfer it was "time to have a record of conversation with him." *Id.*[2] The email also referenced "Jacqui's" departure. *See id.*

November 2022 Discipline

On November 2, 2022, Opfer and Spadaro issued Plaintiff a counseling form. (Doc. 25-1, at 305-06).[3] It opened with: "Since the pandemic, we have implemented many committee-based calls, that involve several departments, with the goal to improve interdepartmental communications and increase overall project efficiency." *Id.* at 305. It continued by saying "[s]ince implementation, there have been several instances where other team members have felt [Plaintiff] embarrassed and spoken down to them in front of their fellow team members," followed by "an increase in complaints regarding your leadership style and communication practices (both verbal and via email)." *Id.* at 305. As examples of "lack of leadership," the form set forth failure to complete tasks, showing up late to team events, disclosing a team member's bonus to another team member, meetings running over time, and indicating he "would no longer be[] scheduling any meetings for the first 9 business days of the month." *Id.* As examples of "communication issues," the counseling form described emails perceived as condescending, refusing to acknowledge concerns of team members, and failing to show up for meetings he set. *Id.* The counseling form concluded:

> However, as a Controller, it is extremely important that you acknowledge and respect all team members, even if you do not agree with them. Also, your sarcastic, condescending tone in emails and phone calls will not be tolerated any further. Due to the severity of these concerns, we will be placing you on a formal

---

2. Defendant's "Corrective Counseling" policy provided for "progressive coaching levels" for discipline. (Doc. 25-1, at 268). These were, in order, (1) Record of Conversation, (2) Formal Reminder; (3) Final Warning; and (4) Follow-up or Separation. *Id.* at 268-69. The Policy also provided that it "does not modify the status of employees as employees-at-will in any way restricts [Defendant's] right to bypass the counseling procedures suggested." *Id.* at 268.
3. The form was originally marked as a "Formal Reminder," but was later changed to a "Record of Conversation" on November 30, 2022. *See* Opfer Depo., Doc. 26-1, at 57.

> reminder. We are hopeful that you can correct these concerns but if we do not see immediate sustained improvement, we will be required to provide additional disciplinary action, up to and including termination.

*Id.* at 306.

Plaintiff disputes the accuracy of the complaints cited. (Plaintiff Depo., Doc. 25-1, at 84). He also did not sign the form when it was presented to him. *Id.* In the initial meeting to present the counseling, Opfer testified she "had to stop the meeting because of how aggressive [Plaintiff] got with [Spadaro]." (Opfer Depo., Doc. 26-1, at 61).

On November 16, 2022, Spadaro emailed Plaintiff, copying Opfer, requesting to "schedule a follow up meeting with you to finalize your write up" and offering times to meet. (Doc. 25-1, at 285). Plaintiff responded the following day, requesting a copy of the employee handbook before he would be ready to meet. *Id.* Opfer pointed Plaintiff to where it was located and then stated: "We have scheduled this meeting on November 30th at 10:00 a.m. Your attendance is required." *Id.* at 284. Plaintiff responded: "Sorry, but I have my own meetings on this matter scheduled that week that I cannot reveal and so I cannot make the meeting on 11/30. Based on what occurs I will get back with you both or a [Defendant] Board Member will." *Id.* The following Monday, Opfer wrote:

> I wanted to take the weekend to think about this, and give you some time to process everything, as well. The goal of our follow up meeting was to have a conversation and talk about how we can help you, and what that plan would look like going forward. You yourself said in that meeting that this past year has been difficult and we can tell you are stressed and are not the old BIG person we knew in the past. We are a team, and when we see someone having struggles, we want to help them. We value you and want to do whatever we can.
>
> Josh [Frederick, Defendant's CEO] and I would like to meet with you in the next week or so. Please look at your calendar and send me a few dates. Josh's schedule is very busy, so we may have to be flexible to meet with him.

*Id.* at 283. Plaintiff responded: "No thank you Sarah. This is a Board level matter." *Id.* Opfer replied, copying Frederick, and stating, *inter alia*, "After the email, we did inform the board of the situation. Which member of the board would you like to meet with, and I can help coordinate that meeting." *Id.* Frederick then further responded he would be "more than happy to accommodate a meeting with any of the board members," but also stating that "[e]ither way, three officers have now requested a meeting, to finalize a simple performance review, and we need to retain some kind of structure." *Id.* at 282.

The evening of November 28, Frederick emailed several individuals noting there was "a situation where" Plaintiff was "being insubordinate and defiant to meeting with any of the officers." (Doc. 31-8, at 74). It stated if Plaintiff did not "reply to [Frederick's] email request for a meeting and to finalize the performance review, we may need to terminate quickly." *Id.* It also stated he "hope[d] cool heads prevail and [Plaintiff] is able to somehow get past this performance review." *Id.*

In advance of a November 29 call with Plaintiff, Defendant prepared a termination letter signed by both Opfer and Spadaro. (Doc. 31-8, at 76-77). (Opfer Depo., Doc. 26-1, at 76). The draft letter stated Plaintiff would be placed on a six week leave of absence and then terminated on January 10 due to his "blatant refusal to meet with either of [his] direct reports." (Doc. 31-8, at 76). Opfer testified: "I thought, depending on what he brought, he might need some type of leave of absence or an accommodation, to be quite honest, de[p]ending on what was going on. . . . I wasn't sure, based on the meeting with the write-up, what was going on with him" *Id.* at 77-78. Opfer also testified she went into the November 29, 2022 call "prepared to term[inate]" Plaintiff's employment. (Opfer Depo., Doc. 26-1, at 79) ("[W]e were prepared to term[inate] in

that meeting."). She testified Ryan Williams, Chief Legal Officer, and possibly Spadaro were involved in those conversations that led to the decision. *Id.* at 80.

The meeting was ultimately held on November 29. (Plaintiff Decl., Doc. 31-1, at 4). During that meeting, however, Plaintiff raised the tax issue. (Opfer Depo., Doc. 26-1, at 83-86). Opfer testified Williams immediately stopped the meeting and said "We have a compliance committee for this reason. We can talk through your concerns." *Id.* at 85. This was the first time Opfer became aware of Plaintiff's tax-related complaints. *Id.* at 36-37. Plaintiff was not terminated during that meeting. *Id.* at 86.

On November 29, Plaintiff emailed Opfer (copying Williams, Spadaro and Frederick) asking about a compliance meeting. (Doc. 31-8, at 78). After Opfer responded, Frederick responded only to Opfer, Williams, and Spadaro, stating *inter alia*:

> If he starts diving into the weeds on CPA stuff, it would be best to invite me into the meeting, to start poking holes in his small view of where NOMS is headed. Or, if you do not want to do that, he needs to write down his concerns, and I can poke holes that way.
>
> It just bothers me that our controller is saying, "I don't like the direction of the company."
>
> . . .
>
> Let me know when/where and if I should participate….but I don't want him to go down a CPA-related rabbit hole without correcting and poking holes in his "compliance" concerns. And I would also remind him he is in management and if he has these types of concerns, there is a process he should have followed….he just cannot make these random statements at the time he is being written up for performance reviews.

*Id.* at 80.

<u>Compliance Committee Investigation</u>

Williams and Opfer serve as Compliance Officers, as does Dr. Tony Desmond. (Opfer Depo., Doc. 26-1, at 86-87). Other physicians serve on the compliance committee, as does the

Chief Population Health Officer and an IT employee. *Id.* at 87-88. The CEO also sometimes sits in on meetings. *Id.* at 88.

The compliance committee reached out to outside CPA firm Meaden & Moore about Plaintiff's concerns. *Id.* at 100; *see also* Doc. 31-8, at 86-88.

On December 9, 2022, Plaintiff submitted written responses to the November 2, 2022 counseling form. *See* Doc. 31-8, at 91-92. Therein, as it relates to the tax concern, Plaintiff stated:

> I have stated my 'actual examples' with the compliance committee for an investigation to be made over concerns of Federal, State, and City Tax Laws being recklessly broken possibly with an intent to deceive in a long-term pattern of tax aggressiveness that has gone too far with the 2021 and possibly 2022 Financials and K-1's. I have also experienced an extreme abuse of power directly pointed at me because of myself not agreeing with this type of attitude towards following the tax and accounting laws required in this country at NOMS.

*Id.* at 91.

In December 2022, Meaden & Moore provided a response to Plaintiff's concerns, which was shared with Plaintiff. (Doc. 25-1, at 309-11);[4] *see also* Plaintiff Depo., Doc. 25-1, at 157-61. Plaintiff was never permitted to speak with Meaden & Moore directly. (Plaintiff Decl., Doc. 31-1, at 5).[5] Plaintiff believes this indirect communication led to information being lost in translation and Meaden & Moore never fully understood his concerns. *Id.*

---

4. This response contains a December 21, 2022, date, Defendant's company name at the top, and states: "*Attendees: Ryan Williams, Chief Legal Officer – Sarah Opfer, Chief HR Officers (sic) – Shawn Biggins, Controller*. (Doc. 25-1, at 309). Thus, it is unclear if Meaden & Moore authored it on that date or if it was presented to Plaintiff on that date, but it appears to be the latter. Regardless, Plaintiff testified this was the response from Meaden & Moore he was provided. *See* Plaintiff Depo., Doc. 25-1, at 160.

5. Plaintiff further asserts his concerns were instead communicated through Opfer or Spadaro to Meaden & Moore. (Plaintiff Decl., Doc. 31-1, at 5). In its Motion to Strike, Defendant contends Plaintiff's Declaration on this point is inconsistent with his deposition testimony. (Doc. 32, at 13). Specifically, it cites Plaintiff's deposition testimony that only Opfer and Williams were on the Compliance Committee. *Id.* (citing Plaintiff Depo., Doc. 25-1, at 104-05). But, as Plaintiff

Plaintiff provided follow up questions after Meaden & Moore's initial December 2022 response. *Id.* at 158. In January 2023, Meaden & Moore provided a second opinion/explanation responding to these follow up concerns and again stating there was nothing improper about Defendant's approach. *See* Doc. 25-1, at 312-13.[6] This was provided to Plaintiff on January 23, 2023. (Plaintiff Depo., Doc. 25-1, at 162-65).

<u>Spadaro Emails Regarding Performance / Retaliation Complaint</u>

From December 13, 2022 through January 24, 2023, Spadaro sent or forwarded Opfer several emails for what he at least twice referred to as a "Shawn file" identifying alleged performance issues. *See* Doc. 31-8, at 93 ("For your Shawn file. . . . He never mentioned anything to me, but I'm sure he will have 100 excuses on why it's late."); *id.* at 101 ("Shawn file. See highlighted in yellow."); *id.* at 106 ("He's very draining and cannot follow simple instructions."); *id.* at 129 ("Here is a perfect example of where Shawn cannot let the team manage their own process of responding back to email questions."); *id.* at 133 ("Perfect example of Shawn's lack of responsiveness and time management.").

On January 23, 2023, Plaintiff told Opfer he felt he was being retaliated against by his boss. *See* Doc. 31-8, at 125-26 (email from Opfer to herself). Opfer wrote she told Plaintiff she "had zero knowledge of any compliance concerns" when he was originally written up in November 2022. *Id.* at 125. Opfer did not escalate this complaint of retaliation or investigate it

---

points out, this is not necessarily contradictory. *See* Doc. 34, at 8. That is, he does not dispute Spadaro was not on the Compliance Committee, but instead "merely states that Spadaro as well as Opfer, continued to act as a go-between with Meaden regarding [his] tax complaints." *Id.* Regardless, for purposes of the present Motion, it is sufficient there is no factual dispute over Plaintiff's assertion he was not permitted to communicate with Meaden and Moore directly.

6. Again, this contains a January 23, 2023, date, Defendant's company name at the top, and states: "*Attendees: Ryan Williams, Chief Legal Officer – Sarah Opfer, Chief HR Officers (sic) – Shawn Biggins, Controller*. (Doc. 25-1, at 312). Thus, it appears it was presented to Plaintiff on this date. *See* Plaintiff Depo., Doc. 25-1, at 163. The parties do not dispute this was Meaden & Moore's response.

because she thought she and Plaintiff had "talked through the concerns he had reported to compliance, and it was just part of the conversation." (Opfer Depo., Doc. 26-1, at 148-49).

Human Resources Investigation

Ericka Harrington was Defendant's Director of Human Resources. (Harrington Depo., Doc. 28-1, at 8). Harrington testified she "was involved" with Plaintiff's employment "starting in November" 2022. *Id.* at 21. She stated, "around November we had, you know, some just verbal complaints in the office about [Plaintiff's] leadership, the way team members were feeling" and she "was asked to investigate, you know, get some additional detail about those, where [Opfer] had to recuse herself from that." *Id.* at 26-27; *id.* at 27 (describing "the end of November time frame" as when Opfer asked her to look into these complaints and "verbal complaints at the very end of November, early December that started rolling in from the team about . . . [Plaintiff] and the way he was making team members feel").

Harrington testified she was never informed of Plaintiff's tax-related complaints and although Opfer indicated she was recusing herself, she did not say why. (Harrington Depo., Doc. 28-1, at 27-30). Plaintiff also testified neither Harrington, nor any of the employees who reported to him she interviewed, had any knowledge of his complaints. (Plaintiff Depo., Doc. 25-1, at 137-38, 144-45). Harrington testified she was directed to "meet with the team and . . . get a temperature on how things were going and individually meet with them." (Harrington Depo., Doc. 28-1 at 29). She said Opfer did not give her any further parameters, and Harrington "already had some team members divulge to [her] that . . . things were getting very stressful within the department in terms of the leadership of lack thereof." *Id.* at 29-30. Harrington testified various members of Plaintiff's team had made "comments about Shawn and his leadership style or how they made him feel (sic)." *Id.* at 31. These were not formal conversations

and were not documented. *Id.* at 31-32. She did not have any other discussions with Plaintiff's team members between November 2022 and January 2023. *Id.* at 39.

Harrington had no recollection of reviewing Plaintiff's summer 2022 performance review or any of its comments, nor having seen the November 2, 2022, counseling form. *Id.* at 22-23. Harrington stated Opfer never told her Plaintiff had made a complaint of retaliation, nor was she asked to investigate any such claim. *Id.* at 26.

Harrington testified she conducted interviews with Plaintiff's team members in January 2023. (Harrington Depo., Doc. 28-1, at 35-36). She interviewed Diane Deno and Becky Booker on Tuesday, January 17, 2023; Kylie Ostheimer and Shawna Taylor on Wednesday, January 18, 2023; and Rob McRae on Wednesday, January 25, 2023. *Id.* at 35-38.[7]

The morning of January 26, 2023, between 10:20 and 10:27 a.m., Harrington sent her notes summarizing her conversations with Booker, Deno, Taylor, and Ostheimer to each employee, respectively. *See* Doc. 31-8, at 135-40, 144-47. Each email started with: "Below is what I am submitting regarding our conversation about [Plaintiff], please let me know if you agree or want anything changed." *See id.*[8]

7. In response to an email from Opfer on February 28 (about three weeks after Plaintiff's termination) asking, "Can you respond with the dates and times that you met with each of [Plaintiff's] team members?", Harrington sent these dates and times. *See* Harrington Depo., Doc. 28-1, at 37-38; Doc. 31-8, at 152.

8. Plaintiff objects to the Court's consideration of these emails on hearsay grounds. (Doc. 31, at 29-30). However, the Court agrees with Defendant that it can properly consider these emails and the statements contained therein to show the effect on the listener (here, Harrington) or Harrington's state of mind and motive. *See, e.g.*, *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598 (6th Cir. 2007) ("[W]itness statements contained in an investigative report may be considered on summary judgment 'not to prove their truth, . . . but to demonstrate the state of mind and motive of Defendant's managers in discharging Plaintiff.'") (quoting *Haughton v. Orchid Automation*, 206 F. App'x 524, 532 (6th Cir. 2006)).

In these summary notes, Harrington reported Booker said Plaintiff made employees feel unvalued, beneath him, and uncomfortable. *See id.* at 136. Deno reported Plaintiff used words like Superwoman "or pictures that are unnecessary and demeaning toward women and he only uses them regarding women," and the tone of his emails suggested he didn't respect women. *See id.* at 137-38. Deno further reported she used to frequently hear Plaintiff yelling at McRae. *Id.* at 138. As to Taylor, Harrington wrote she started the meeting by saying "most of what she had to say she already told [Opfer] or [Spadaro] in a previous meeting." *Id.* at 140. She described an idea of hers being dismissed, explained Plaintiff "want[ed] everyone's opinions to match his," and complained of unnecessary calls and meetings. *Id.* at 140-41.

Deno responded at 10:25 a.m.: "That's fine. I don't want to be mean to him in any way because I have done some things wrong too. I'm working at it though." *Id.* at 137. Booker responded at 10:26 a.m., "Yes I agree with the statements below." *Id.* at 135. Taylor responded at 10:35 a.m. with some corrections to the statement Harrington prepared. *Id.* at 139. Harrington responded, "OK I will add these! Thank you!" *Id.*

Harrington forwarded each employee's response email (Booker, Deno, and Taylor) to Spadaro shortly after receipt (at 10:51-10:52 a.m.). *See id.* at 135 137, 139.

Ostheimer responded to Harrington's email at 11:34 a.m., noting she had copied the statement Harrington sent her and added changes in red, as well as added a supplemental statement. *Id.* at 144-47; *see also* Doc. 25-1, at 298. Ostheimer's edited statement in response to Harrington noted she felt micromanaged and that Plaintiff did not provide clear guidance, did not assist with problems, and often wasted time. (Doc. 31-8, at 144-45); *see also* Doc. 25-1, at 297-98. She noted Plaintiff used to be consistently late for meetings or not show up, but this behavior had improved. (Doc. 25-1, at 298). She then supplemented her statement to note the prior

statement was accurate, but "in fairness she would like to include some updated information." *Id.* She noted both Spadaro and Plaintiff had spoken to her about some of her frustrations (although she did not raise them) and there had been some improvement in the issues cited in her original statement. *Id.* Harrington forwarded this statement to Spadaro at 2:11 p.m. the same day. (Doc. 31-8, at 144).[9]

Harrington testified she and another Human Resources employee, Mia Feldmann, reviewed these statements together in person in her office, but Feldmann was not copied on the emails. (Harrington Depo., Doc. 28-1, at 70-72). The same day (January 26, 2023), at 11:14 a.m. – after Booker, Taylor, and Deno had responded to Harrington's emails, and before Ostheimer had responded – Feldmann sent the following email to Opfer, Harrington, and Spadaro with the subject line: "S. Biggins – Determination." (Doc. 31-8, at 142). It stated:

> On Thursday, January 26, 2023, Sarah Opfer, CHRO, approached Ericka Harrington, HR Director and me, HR Manager[,] asking if we could review the documentation regarding Shawn Biggins. Sarah asked us to determine the next corrective action steps for Shawn and recused herself.
>
> Upon examining the emails, documentation, and statements from members of the accounting team, Ericka and I feel the next step for Mr. Biggins is termination. Mr. Biggins has shown a lack of professionalism, lack of judgment, and has been subordinate [sic] to both Sarah and his direct supervisor, Gio Spadaro. Mr. Biggins has not effectively led his direct reports which has caused delays in the team's workflow.

---

9. Harrington also sent Opfer an email on February 28 (after Plaintiff was terminated) that starts with "Hey Rob: This is what I am submitting please let me know if you agree or want anything changed." (Doc. 29-4, at 1). It then says, "Meeting with Rob McRae" and, like the other emails, appears to summarize a meeting. *Id.* Those notes indicate Plaintiff dominated meetings that were supposed to be collaborative and did not allow others to speak. *Id.* Harrington further noted McRae reported meetings were uncomfortable, and this included screaming in a meeting with outside data vendors. *Id.* Harrington did not recall if she ever sent this email to McRae or if she ever received a response. *See* Harrington Depo., Doc. 28-1, at 58-60.

*Id.*[10] Harrington responded to the email at 11:30 a.m.: "I agree with the below. Thank you for putting together this determination, Mia." *Id.* Harrington further testified she directed Feldmann to write the initial determination email. (Harrington Depo., Doc. 28-1, at 70).

Harrington testified historically with Defendant, Human Resources "has the final say" in terminations, typically with input from a manager or supervisor. (Harrington Depo., Doc. 28-1, at 20). However, she testified "[i]n the case of Shawn Biggins, [she] made that decision on [her] own . . . [a]fter reviewing [her] statements from team members and documentation." *Id.*; *see also id.* at 21 (Q: "[I]n relation to Shawn Biggins' termination, you believe you made that decision directly?" A: "Correct.").

Plaintiff was officially terminated on February 7, 2023. *See* Doc. 31-8, at 149. The termination form stated:

> Since our initial meeting back in November, we have continued to receive several complaints from vendors and fellow team members[] citing your lack of professionalism, failure to lead the team, and continuous condescending and sarcastic treatment to your direct reports. We have attempted to coach you and provide constructive criticism, in hopes of improvement; but you refuse to accept accountability and ownership.
>
> After thoroughly investigating these claims, we have decided it is best to part ways. We wish you the best of luck in your future endeavors.

*Id.*

## STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When

---

10. Defendant contends Feldmann was never deposed or subpoenaed and thus the statements in her email are hearsay and cannot be used to prove the truth of the matter asserted." (Doc. 33, at 6 n.3). The Court disagrees. Harrington's response email adopts Feldmann's statement, and Plaintiff seeks to use it to impeach Harrington's testimony regarding when her investigation occurred and what information she had. *See* Fed. R. Evid. 801(d)(1)(A).

considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257; *see also* Fed. R. Civ. P. 56(c)(1). Further, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials").

## DISCUSSION

Defendant contends it is entitled to summary judgment on Plaintiff's retaliation claim because Plaintiff cannot establish a question of fact regarding whether (1) he engaged in protected conduct; and (2) his alleged protected conduct was a contributing factor in his termination. (Doc. 29, at 12-18). Moreover, Defendant contends, even if Plaintiff can establish a prima facie case, there is clear and convincing evidence Plaintiff would have been terminated even in the absence of the protected complaint. *Id.* Plaintiff responds issues of fact preclude

summary judgment on each of Defendant's assertions. (Doc. 31). For the reasons set forth below, the Court finds Defendant has not established entitlement to summary judgment.

Plaintiff asserts a claim for whistleblower retaliation in violation of the Taxpayer First Act ("TFA"), 26 U.S.C. § 7623(d), *et seq*. As the Sixth Circuit recently explained, the TFA "makes it unlawful for an employer to discharge an employee for providing information 'the employee reasonably believes constitutes a violation of the internal revenue laws or any provision of Federal law relating to tax fraud' to the IRS." *Gammons v. Adroit Med. Sys., Inc.*, 91 F.4th 820, 826 (6th Cir. 2024) (quoting 26 U.S.C. § 7623(d)(1)). "[T]he two-part burden-shifting framework set forth in 49 U.S.C. § 42121(b)(2)(B) applies to TFA claims." *Id.* (citing 26 U.S.C. § 7623(d)(2)(B)(iii)).

"Under this standard, [a plaintiff] has to first establish a prima facie case by presenting evidence that satisfies the following elements: (1) he engaged in protected conduct; (2) the defendant[] knew of his protected conduct; (3) the defendant[] subjected him to an adverse employment action; and (4) his protected conduct was a 'contributing factor' . . . to the adverse employment action." *Id.* (citing 49 U.S.C. § 42121(b)(2)(B)(i)).

*Protected Conduct*

There is no dispute Plaintiff complained during his employment of an alleged tax law violation or that Defendant was aware of these complaints. Defendant contends, however, Plaintiff cannot establish the first element of his *prima facie* case because his belief Defendant was violating the law was not objectively reasonable and thus his complaint was not protected conduct.

The parties both rely on *Rhinehimer v. U.S. Bankcorp Investments, Inc.*, 787 F.3d 797 (6th Cir. 2015), a case involving a whistleblower claim under the Sarbanes-Oxley Act. *See* Doc.

29, at 13; Doc. 31, at 19.[11] There, the Sixth Circuit explained "to sustain a complaint based on protected activity . . . 'the complainant need only show that he or she "reasonably believes" that the conduct complained of constitutes a violation.'" *Rhinehimer*, 787 F.3d at 811 (quoting *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 221 (2d Cir. 2014)). "[R]easonable belief involves both a subjective component and an objective component." *Id.* "The subjective component is satisfied if the employee actually believed that the conduct complained of constituted a violation of relevant law." *Id.*

"Objective reasonableness is evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee." *Id.* (quoting *Harp v. Charter Commc'ns, Inc.*, 558 F.3d 722, 723 (7th Cir. 2009)). "[T]he inquiry into whether an employee had a reasonable belief is necessarily fact-dependent, varying with the circumstances of the case." *Id.*

> For this reason, "[t]he issue of objective reasonableness should be decided as a matter of law only when no reasonable person could have believed that the facts [known to the employee] amounted to a violation" or otherwise justified the employee's belief that illegal conduct was occurring. *Livingston v. Wyeth, Inc.*, 520 F.3d 344, 361 (4th Cir.2008) (Michael, J., dissenting) *quoted in Sylvester*, 2011 WL 2165854 at *12. If, on the other hand, "reasonable minds could disagree about whether the employee's belief was objectively reasonable, the issue cannot be decided as a matter of law." *Id.*

*Id.* at 811-12. "An employee need not cite a code section he believes was violated in his communications to his employer, but the employee's communications must identify the specific conduct that the employee believes to be illegal." *Villanueva v. U.S. Dep't of Lab.*, 743 F.3d 103, 109-10 (5th Cir. 2014) (quoting *Welch v. Chao*, 536 F.3d 269, 276 (4th Cir. 2008)). Importantly,

11. As the previous Judge assigned to this case explained, cases interpreting the Sarbanes-Oxley Act's whistleblower protection provisions "are instructive" in interpreting similar provisions in the TFA. (Doc. 9, at 7).

> an employee need not establish the reasonableness of his or her belief as to each element of the violation. Instead, the reasonableness of the employee's belief will depend on the totality of the circumstances known (or reasonably albeit mistakenly perceived) by the employee at the time of the complaint, analyzed in light of the employee's training and experience. *See id.; Wiest*, 710 F.3d at 135 (applying the *Sylvester* reasonable belief standard).

*Rhinehimer*, 787 F.3d at 812.

The Court finds it cannot determine objective reasonableness as a matter of law on the record before it because factual disputes remain. That is, the Court cannot determine "no reasonable person could have believed that the facts [known to the employee] amounted to a violation." *Id.* at 812 (quoting *Livingston*, 520 F.3d at 361 (Michael, J., dissenting)). Defendant's arguments to the contrary are unavailing.

First, the Court finds unpersuasive Defendant's argument that Plaintiff's concern was *per se* objectively unreasonable simply because he had been told it was approved by an outside CPA firm. *See* Doc. 29, at 15. Just because one individual (even one with perhaps similar or greater experience) disagrees does not render a concern *per se* unreasonable.[12]

Second, Defendant faults Plaintiff for not seeking a second opinion "after he was, repeatedly, informed that his opinion was wrong by other professionals." (Doc. 29, at 15). It faults Plaintiff for "fail[ing] to conduct a meaningful investigation." *Id.* But Defendant points to no requirement that one must seek a second opinion for a concern to be objectively reasonable. And Defendant points to no evidence that at the time Plaintiff made his initial complaint, or even in the many months following, it provided Plaintiff with any detailed explanation of its side of the disagreement. *See* Doc. 29, at 3 (Defendant's motion stating "Spadaro informed Plaintiff that

---

12. Indeed, Defendant's argument Plaintiff did not know what records Meaden & Moore was provided strengthens, rather than undermines, the possibility his belief was objectively reasonable, as it provides reasonable grounds on which he could discredit Meaden & Moore's contrary conclusion.

this method was the approved tax process recommended from the outside CPA firm, Meaden & Moore, following the January 2022 initial complaint") (citing in support, Spadaro's deposition testimony: "Q: [D]id you relay to [Plaintiff] what you had talked with the CPA firm about? A: At some point I did, but I don't remember exactly when," (Spadaro Depo., Doc. 27-1, at 68), and Plaintiff's statement in his Amended Complaint Spadaro told him the action is "what he was advised to do by 'accountants,'" (Doc. 5, at 6)). Moreover, as Plaintiff avers, he was not permitted to communicate with the outside CPA firm directly and believed they did not fully understand his complaints, as evidenced by the back-and-forth regarding Plaintiff's concerns (as communicated by agents of Defendant to Meaden & Moore) and Meaden & Moore's responses thereto, up to January 23, 2023. Even if at some point after additional explanation a complaint may become unreasonable, *see Day v. Staples, Inc.*, 555 F.3d 42, 58 (1st Cir. 2009) ("[a] company's explanations given to the employee for the challenged practices are also relevant to the objective reasonableness of an employee's belief in shareholder fraud"), the timing here does not suggest as a matter of law that point was reached, where there was ongoing explanation provided just three days prior to Defendant's decision to terminate Plaintiff (and just over two weeks prior to his actual termination).

Third, Defendant argues Plaintiff "is unable to identify any law or regulation NOMS allegedly violated." (Doc. 29, at 15). But under the law Defendant itself cites:

> plaintiff is not required to prove that the defendants violated a law or cite a particular provision that he believes the defendants violated, [but] general inquiries do not constitute protected activity . . . [T]he reported information must have a certain degree of specificity and must state particular concerns which, at the very least, reasonably identify a respondent's conduct that the complainant believes to be illegal.

*Tonra v. Kadmon Holdings, Inc.*, 405 F. Supp. 3d 576, 589-90 (S.D.N.Y.); *see also Villanueva*, 743 F.3d at 109-10. Here, Plaintiff's complaint has a "degree of specificity and . . . state[s]

particular concerns which . . . reasonably identify [Defendant's conduct] that [Plaintiff] believes to be illegal," *id.*, namely that income from one year was improperly categorized to a different year with different tax consequences. True, as Defendant identifies, Plaintiff struggled to identify a specific statute or tax provision the cited tax practice violated or determine whether taxes were ever actually underpaid as a result of this action. But these are arguments for the finder of fact regarding objective reasonableness.

Fourth and finally, the Court finds Defense expert Zwick's opinion that Plaintiff's concerns were not objectively reasonable simply creates a factual dispute against Plaintiff's own explanation – grounded in his own experience – for the underlying basis for his concerns. On this record, "reasonable minds could disagree about whether the employee's belief was objectively reasonable [and] the issue cannot be decided as a matter of law." *Rhinehimer*, 787 F.3d at 811-12 (quoting *Livingston*, 520 F.3d at 361 (Michael, J., dissenting)). "[T]he reasonableness of the employee's belief depend[s] on the totality of the circumstances known (or reasonably albeit mistakenly perceived) by the employee at the time of the complaint, analyzed in light of the employee's training and experience." *Id.* at 811. These are questions for a jury.[13]

*Contributing Factor*

Defendant next contends it is entitled to summary judgment because there is no evidence Plaintiff's tax-related complaints were a "contributing factor" to his termination. (Doc. 29, at 17-18). This is so, it contends, because Harrington was the decisionmaker and she was not aware of Plaintiff's tax-related complaints, nor were the employees whose complaints Harrington

13. Regarding the remainder of the Motion to Strike, the Court finds it unnecessary to resolve, for purposes of the present summary judgment determination, the two additional purported contradictions between Plaintiff's deposition (or Complaint) and his Declaration. *See* Doc. 33, at 10-12.

investigated and relied upon. *Id.* at 18. Plaintiff responds he can demonstrate a factual dispute regarding this element. (Doc. 31, at 24-27).

To meet the "contributing factor" prong, an individual "does not have to prove his protected conduct was a significant, motivating, substantial, or predominant factor in the adverse personnel decision," but instead must provide evidence that it "alone or in combination with other factors, tended to affect the defendant's decision to fire him." *Gammons*, 91 F.4th at 826.[14] "For there to be causal connection between an adverse employment decision and a protected activity, the relevant decision-maker must have actual knowledge of the protected activity before making the decision." *Burns v. Mahle Engine Components USA, Inc.*, 605 F. App'x 522, 527 (6th Cir. 2015). The employee must prove its employer's "intent to take some adverse employment action against the whistleblowing employee 'because of' his protected whistleblowing activity." *Murray v. UBS Securities, LLC*, 601 U.S. 23, 35 (2024). In other words, the employer must have made "an intentional choice in which that factor play[ed] some role in the employer's thinking." *Id*. at 40 (Alito, J., concurring). "A complainant has the initial burden to demonstrate by a preponderance of the evidence that his protected activity was a 'contributing factor' in the personnel decision." *Mizusawa v. U.S. Dep't of Labor*, 524 F. App'x 443, 446 (10th Cir. 2013).

Plaintiff contends there are questions of fact on the contributing factor prong due to (1) the temporal proximity between Plaintiff's complaints and his termination; (2) Defendant's inconsistent application of its own progressive discipline policies; (3) "shifting explanations" for Plaintiff's termination; (4) statements of antagonism or hostility toward Plaintiff; (5) a change in

14. This "prima facie burden is 'much easier' to satisfy than the burden faced by a *McDonnell Douglas* plaintiff." *Gammons*, 91 F.4th at 826 (quoting *Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 159 (2d Cir. 2013)).

Defendant's attitude toward Plaintiff after his complaints; and (6) Harrington's testimony's self-serving and non-credible nature. (Doc. 31, at 24-27). Plaintiff further references a "cat's paw" theory of liability. *Id.* at 29.

"[T]he term 'cat's-paw' refers to 'one used by another to accomplish his purposes.' In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006) (citations omitted). A plaintiff alleging liability under the cat's paw theory seeks "to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011). A cat's-paw argument requires evidence the ultimate (and manipulated) decisionmaker—the puppet—'followed the biased recommendation' of another—the puppeteer—'without independently investigating the complaint against the employee.'" *Harris v. Pub. Health Tr. of Miami-Dade Cnty.*, 82 F.4th 1296, 1301 (11th Cir. 2023) (quoting *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999)).

To begin, Defendant is correct Plaintiff has pointed to no direct evidence Harrington knew of Plaintiff's tax related complaints. Harrington testified she had no knowledge (Harrington Depo., Doc. 28-1, at 29-30), and Plaintiff himself testified neither Harrington, nor any of the employees who reported to him that she interviewed, had any knowledge of his complaints (Plaintiff Depo., Doc. 25-1, at 137-38, 144-45). Nevertheless, the Court finds Plaintiff has presented circumstantial evidence establishing question of fact regarding whether others with knowledge of those complaints influenced Harrington's termination decision. This evidence includes the January 26, 2023, Feldmann email, which again reads:

> On Thursday, January 26, 2023, Sarah Opfer, CHRO, approached Ericka Harrington, HR Director and me, HR Manager[,] asking if we could review the documentation regarding Shawn Biggins. Sarah asked us to determine the next corrective action steps for Shawn and recused herself.
>
> Upon examining the emails, documentation, and statements from members of the accounting team, Ericka and I feel the next step for Mr. Biggins is termination. Mr. Biggins has shown a lack of professionalism, lack of judgment, and has been subordinate [sic] to both Sarah and his direct supervisor, Gio Spadaro. Mr. Biggins has not effectively led his direct reports which has caused delays in the team's workflow.

(Doc. 31-8, at 142). Again, Harrington responded to the email with: "I agree with the below. Thank you for putting together this determination, Mia." *Id.* This email references "emails" and "documentation," in addition to the evidence of employee interviews Defendant asserts Harrington relied upon. That is, it suggests the universe of material considered went beyond merely those employee statements. Although Defendant argues this email "does not state Opfer influenced the investigation in any respect" (Doc. 33, at 5), references to Plaintiff's insubordination to both Opfer and Spadaro suggest some influence or at least information had been passed along. *See id.* ("asking if we could review *the* documentation") (emphasis added). Combined with Spadaro's forwarding of emails to Opfer for a "Shawn file" with this information at least raises an inference there was overlap between those who knew of the tax complaints and Harrington. This undermines Defendant's argument that "Harrington's investigation and gathering of witness statements was an intervening cause for termination – made without knowledge of previous disciplinary action," (Doc. 33, at 10), when the prior reason for the disciplinary action (insubordination) is cited in the email. Additionally, the email references the "next corrective action steps" for Plaintiff. (Doc. 31-8, at 142). This can permissibly be read to imply a prior corrective action occurred and some knowledge or communication thereof. *See* Doc. 25-1, at 268 (Defendant's "*Corrective* Counseling" policy). Finally, as Plaintiff points out,

Feldmann's statement that Opfer recused herself on January 26, 2023, at least arguably contradicts Harrington's earlier statement that Opfer had recused herself from the process much earlier.

Although Defendant disagrees with Plaintiff's interpretation of this email, and Harrington testified she alone made the termination decision without knowledge of any tax complaint and entirely independently, these are questions for the trier of fact. In short, a reasonable jury could view the evidence and find the Human Resources investigation was walled off entirely from any consideration of Plaintiff's tax-related complaints, and was therefore an independent decision made without consideration of the complaints. But a reasonable jury could also find either Harrington's investigation was set into motion or influenced by Spadaro and Opfer, both of whom had knowledge of these complaints, and thus it was not the independent investigation Defendant contends.

<u>Clear and Convincing Evidence</u>

If a plaintiff satisfies a TFA *prima facie* case, the burden shifts to the defendant to "demonstrate[], by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior." 49 U.S.C. § 42121(b)(2)(B)(ii). "Clear and convincing is a high burden," met by "overwhelming and uncontroverted evidence." *Gammons*, 91 F.4th at 828; *see also Disner v. Westinghouse Elec. Corp.*, 726 F.2d 1106, 1111 (6th Cir. 1984) ("Generally, when clear and convincing evidence is required, juries should be instructed that they must be persuaded that the truth of the contention is highly probable, as opposed to more likely than not.").

Defendant argues it can satisfy this burden because "[t]he evidence that Plaintiff was terminated without consideration of the tax complaint is overwhelming." (Doc. 29, at 19). They

cite: (1) that Opfer and Williams planned to terminate Plaintiff in November 2022, before either knew of the tax complaint; (2) the Human Resources investigation was "walled-off" from the tax complaint; and (3) the Human Resources investigation demonstrated Plaintiff "created a hostile work environment for his direct reports and peers" and Plaintiff had violated Defendant's policies. *Id.* at 19-20.

First, although Defendant argues "[i]t was the tax complaint in the face of discipline that initially saved his job, not the opposite," (Doc. 29, at 20), the record is not definitive that Plaintiff necessarily would have been fired during the November 29, 2022, meeting absent him raising the tax issue. Although a termination letter had been drafted and termination was certainly on the table (or even perhaps likely), Opfer testified it was not a finalized decision. *See* Opfer Depo., Doc. 26-1, at 77-78; *see also* Doc. 31-8, at 74 (Frederick email stating they "may" need to terminate Plaintiff but he "hope[d] cool heads prevail and [Plaintiff] is able to somehow get past this performance review"). Moreover, this basis for termination is not the same basis for termination ultimately provided.

Second, as set forth above in analyzing whether Plaintiff's tax complaint was a contributing factor in his termination, there are factual questions that prevent the Court from determining whether the Human Resources investigation was truly independent of or unaffected by the tax complaint. Thus, the Court cannot determine clear and convincing evidence shows Plaintiff would have been terminated even absent the tax complaint.

True, Defendant marshals significant evidence that it had an independent basis to terminate Plaintiff's employment – his arguably insubordinate behavior in refusing to meet with his supervisors, and reports from other employees of dissatisfaction with his leadership skills and the work environment. Should a jury find Plaintiff has met his prima facie case, it could also find

this evidence sufficient to meet the "clear and convincing" standard. But the Court will not so find as a matter of law. Thus, Defendant is not entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Defendant's Motion for Summary Judgment (Doc. 29) be, and the same hereby is, DENIED, and it is

FURTHER ORDERED that Defendant's Motion to Strike Plaintiff's Untimely Expert Report and Exclude Lay Statements (Doc. 32), be and the same hereby is, DENIED.

s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

Dated: September 29, 2026